UNITED STATES of America, Plaintiff,

v.

**Robert HERNANDEZ, Defendant.**

No. 95–40024–01–SAC.

United States District Court,
D. Kansas.

May 18, 1995.

954

John J. Ambrosio, Topeka, KS, F.G. Manzanares, Topeka, KS, Tony Chavez, Odessa, TX, for defendant.

James E. Flory, Office of U.S. Atty., Topeka, KS, for the U.S.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant's motions to suppress statements (Dk. 20) and to suppress evidence (Dk. 21). The government filed a written response in opposition.[1] (Dk. 27). The court heard argument and evidence on these motions on May 16, 1995. After reviewing the parties' briefs and the controlling law, the court is ready to rule.

## FACTS

Around 10:40 a.m. on March 26, 1995, Trooper B.K. Smith with the Kansas Highway Patrol was patrolling I–35 highway in Osage County, Kansas. Trooper Smith was travelling northbound on I–35 and checking the speed of southbound traffic with his radar. Ahead of him in the northbound lane of traffic, Trooper Smith saw a blue car in the passing lane pull in front of a U–Haul truck and apply its brakes. When the U–Haul truck braked in response to the blue car's brake lights, Trooper Smith saw that the U–Haul truck's right brake light did not operate. As he sped up to stop the U–Haul truck, Trooper Smith saw the U–Haul truck cross the solid white line separating the driving lane and the right shoulder.

Without seeing the driver or knowing the driver's gender or race or that of any occupants, Trooper Smith drove up behind the U–Haul truck and signaled with his lights for it to pull over. Trooper Smith testified he stopped the truck for the stop lamp violation and for the lane violation. As he walked toward the truck cab, Trooper Smith saw that the driver was the only occupant. Smith detected the strong smell of "soap" coming from the cab. From his training and experience, Smith knew that various strong odor-producing items are often used to mask the odor of drugs.

Trooper Smith asked in English for the driver to produce his driver's license and the truck rental agreement. The driver provided a Minnesota driver's license that identified him as Robert Hernandez of St. Paul, Minnesota. Smith noticed that Hernandez's address in St. Paul was similar to or in proximity to the address of another individual who was carrying a large amount of cash when Smith stopped him in February of 1995. Trooper Smith asked Hernandez in English to step from the truck and accompany him to the patrol car. Smith testified it was his routine and that of other troopers to escort the drivers to the patrol car during the license check and citation process. Smith noticed that Hernandez appeared nervous as his hands were shaking and his breathing was rapid and shallow.

During the license check and the citation writing, Smith conversed in English with Hernandez about his travel plans. Hernandez told Smith he was travelling from Odessa, Texas to St. Paul, Minnesota. Hernandez said he was a roofer and was moving his roofing supplies and other items like clothes and furniture to St. Paul, Minnesota. Hernandez was able to communicate with Smith using his limited English skills and hand gestures.

Trooper Smith issued a written warning citation for the brake light and the lane violations and returned to Hernandez his license and rental agreement. Smith told Hernandez: "That is all I have for you." As Hernandez turned in his seat towards the patrol car door, Smith asked if he could ask Hernandez a few more questions. Hernandez answered "yes."

Smith inquired in English if Hernandez was hauling anything illegal. Hernandez answered "no." Trooper Smith then asked Hernandez in English if he could search the truck. Upon receiving a "yes" from Hernandez, Smith repeated the question in Spanish

---

1. The defendant originally filed his motions without supporting memoranda. Even though the motions did not identify the defendant's legal theories or authorities, the government responded addressing the issues of a pretextual stop, consent for the search, and voluntariness of statements. On order of the court, the defendant later filed a memorandum that addressed those three issues, as well as contentions concerning reasonable suspicion for the stop, unlawful detention after the stop, and lack of consent. By not timely filing a memorandum, the defendant frustrated the court's goal of having both sides identify and brief all legal issues prior to the motions hearing.

and pointed to the question in his "Street Officers' Complete Spanish Guide." Smith had Hernandez read the question aloud. This question asks, "Puedo registrar su carro?"[2] Hernandez answered this question "yes" in Spanish.[3]

After receiving Hernandez's consent, Trooper Smith asked Hernandez to unlock the cargo doors on the U–Haul truck. Hernandez retrieved the keys from the truck cab and returned to the rear of the truck. Smith told him to unlock the padlock. Hernandez looked upward and exhaled before unlocking the padlock and opening the cargo doors. With the doors opened, Trooper Smith was immediately struck by the strong smell of what he knew by training and experience was "raw" or non-burning marijuana. Smith looked over the cargo area and saw several taped new packing boxes towards the front. Smith climbed into the cargo area and opened one of the boxes. He saw what appeared to be blocks of marijuana wrapped in gray duct tape. Smith drew his weapon and arrested Hernandez. Trooper Smith received a positive reading for marijuana on his field test of one of the taped blocks. After the arrest, Smith handed his Spanish guidebook to Hernandez and asked him to read aloud the *Miranda* warnings written in Spanish. Hernandez said he understood his rights and would cooperate.

After he was taken to the Osage County Sheriff's Office, Hernandez was interviewed by Special Agent Thomas Walsh with the United States Drug Enforcement Administration. Walsh, who speaks Spanish, read Hernandez his *Miranda* rights in Spanish and had Hernandez follow along the reading on a *Miranda* card written in Spanish. Hernandez signed the card. When asked by Walsh, Hernandez said that he had no questions about those rights and that he would talk with Walsh. Hernandez told Walsh about his transportation of the marijuana. During the interview, Hernandez invoked his right to an attorney and the right to remain silent. At that point, Walsh ceased the interview.

## ISSUES

The defendant's motions break down into the following issues:

1. Did Trooper Smith have reasonable suspicion to stop Hernandez for traffic violations?

2. Did Trooper Smith make a pretextual stop?

3. Did Trooper Smith unreasonably detain Hernandez?

4. Was Hernandez's consent to search voluntary?

2. Hernandez's testimony demonstrates he understood at the time that Trooper Smith was asking for permission to search the truck.

3. The court rejects as not credible much of the defendant's testimony. Specifically, the court does not believe that defendant answered this question in Spanish, "If I have to." Such an answer conveniently creates the possibility that Trooper Smith may have confused the Spanish word for "if" with the Spanish word for "Yes." Prior to answering that question, Hernandez knew that Smith was relying on his Spanish guide to ask the questions and that Smith's language skills in Spanish were extremely limited. It seems unlikely that a person, like Hernandez, who wants to communicate his answer would choose to express a vague conditional response in a language not understood by the listener. The court believes Hernandez's English language skills, though probably limited, were sufficient for him to express a similar conditional response or, at least, to inquire if his consent was required. The evidence shows that Hernandez's communication skills in English were enough or

that at least Hernandez believed they were enough for him to negotiate and rent the U–Haul truck, to purchase boxes from the U–Haul company, to comply with Smith's requests for the driver's license and rental agreement, to tell Smith that he was a roofer, to describe what was in the truck, to obtain a driver's license from Minnesota, to make a cross-country trip by himself, and to live in St. Paul, Minnesota for at least one year. The U–Haul rental agent, Craig Trice, told Special Agent Walsh that a person identifying himself as Robert Hernandez negotiated the rental agreement for the U–Haul truck and that Hernandez used "Tex–Mex" or a combination of English and Spanish in talking with Trice, who did not speak Spanish. Having done all of this with limited English skills, Hernandez seems more than able to ask "Do I have to?" If Hernandez had given a conditional response, the court believes it would have been more than a single vague sentence spoken in a language that Smith did not appear to comprehend. For these reasons, the court believes it more probable than not that Hernandez simply answered "yes" to Smith's request to search the truck.

5. Were Hernandez's statements voluntary?

"Although 'the proponent of a motion to suppress bears the burden of proof' in general terms, ..., whenever the government relies on the consent of the defendant to validate a search the government bears the burden of proving that the consent 'was freely and voluntarily given.'" *United States v. Sandoval,* 29 F.3d 537, 539 (10th Cir.1994) (citations omitted).

## REASONABLE SUSPICION TO STOP

 The Fourth Amendment protects against unreasonable search and seizures. *United States v. McSwain,* 29 F.3d 558, 561 (10th Cir.1994); *United States v. Pena,* 920 F.2d 1509, 1514 (10th Cir.1990), *cert. denied,* 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991). "The stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the means of the Fourth Amendment. An ordinary traffic stop is a limited seizure, however, and is more like an investigative detention than a custodial arrest." *United States v. Walker,* 933 F.2d 812, 815 (10th Cir.), *reh'g denied,* 941 F.2d 1086 (10th Cir.1991), *cert. denied,* 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992); *see United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.) ("A traffic stop is an investigative detention analogous to a *Terry*-stop.") (citing *United States v. Soto,* 988 F.2d 1548, 1554 (10th Cir.1993)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994); *United States v. Sanchez,* 866 F.Supp. 1542, 1550 (D.Kan.1994).

 "[A] brief investigative stop only requires 'some objective manifestation that the person stopped is ... engaged in criminal activity.'" *United States v. Eylicio–Montoya,* 18 F.3d 845, 848 (10th Cir.1994) (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). "[I]n light of the totality of the circumstances, the officers must have a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* In short, only an articulable and reasonable suspicion of criminal conduct is necessary for an investigative stop of an automobile. *United States v. Arzaga,* 9 F.3d

91, 93 (10th Cir.1993). Having seen the brake light fail to work and the truck fail to maintain a single lane of traffic, Trooper Smith had a particularized and reasonable suspicion to stop Hernandez for the traffic infractions. The government has introduced a photograph taken on March 26, 1995, shortly after the stop that shows the left rear brake light glowing but not the right one.

## PRETEXTUAL STOP

 "A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop." *Arzaga,* 9 F.3d at 93 (quoting *United States v. Guzman,* 864 F.2d 1512, 1515 (10th Cir.1988)). Simply put, a pretextual stop is one that is ostensibly made for a lawful reason but this reason is really a pretext for another reason that is impermissible. *United States v. Maestas,* 2 F.3d 1485, 1489 (10th Cir.1993). "'The classic example, presented in this case, occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in illegal drug activity.'" *United States v. Castillo,* 864 F.Supp. 1090, 1094 (D.Utah 1994) (quoting *Guzman,* 864 F.2d at 1515). Because the government has offered a justification for the stop, Hernandez must now carry the burden of proving that the asserted justification is pretextual. *United States v. Maestas,* 2 F.3d at 1491–92.

 The presence of an improper motive, by itself, does not compel a finding that the stop was pretextual. *United States v. Maestas,* 2 F.3d at 1489. At the same time, the presence of a valid reason does not preclude a finding that the stop was pretextual. *United States v. Fernandez,* 18 F.3d 874, 876 (10th Cir.1994). The Tenth Circuit employs "an objective test to determine whether a mixed motive stop is improper: we ask not whether the officer *could* have validly made the stop, but instead whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose." *United States v. Fernandez,* 18 F.3d at 876 (citing *Guzman,* 864 F.2d

at 1517). In other words, this entails an objective analysis "and not an inquiry into the officer's subjective intent." *United States v. Lyons*, 7 F.3d 973, 975 (10th Cir. 1993) (citing *Guzman*, 864 F.2d at 1515).

■ Hernandez has failed to meet his burden of proving that his stop was pretextual. The court accepts as credible Trooper Smith's testimony regarding the brake light and the practice of giving warning citations. It is undisputed that the right brake light on the U–Haul truck was inoperative at the time of the stop. Written warnings for inoperative brake lights are a common practice, and the Kansas Highway Patrol gives its troopers a special form for issuing warning citations. The troopers consider the warnings to be a courtesy in that they alert the operator that the car or truck has a defect of which the operator was probably not aware. The warning notifies the operator to repair the defect at the operator's earliest convenience. Based on the evidence of record, the court has no basis for considering the inoperative brake light on a U–Haul truck to be such a minor infraction or an insignificant matter that a reasonable officer under the same circumstances would not have stopped the truck and issued the defendant a warning.

The court accepts as credible Trooper Smith's testimony that the U–Haul truck driven by Hernandez crossed over the white line onto the shoulder and then was steered back onto the roadway. Trooper Smith testified that he and other officers routinely stop vehicles for not maintaining a single lane. By experience, troopers know that lane violations are an indication that the driver may be sleepy or impaired.[4] The court finds that a reasonable officer in Trooper Smith's position would have stopped Hernandez for the inoperative brake light and the lane violation in the absence of a wish or desire to search the U–Haul truck for contraband.

## REASONABLE DETENTION

■ The reasonableness of the stop "is evaluated in two respects: first, whether the officer's action was justified at its inception, and second, whether the action was reasonably related in scope to the circumstances that first justified the interference." *Gonzalez–Lerma*, 14 F.3d at 1483 (citing *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)). The officer making a routine traffic stop may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation or warning. *United States v. Jones*, 44 F.3d 860, 872 (10th Cir.1995); *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir.1993). "Once the driver has produced a valid license and proof that he is entitled to operate the car, 'he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.'" *United States v. Walker*, 933 F.2d at 816.

■ Delay or detention[5] caused by questioning unrelated to the initial stop is justified in two circumstances. *United States v. Gonzalez–Lerma*, 14 F.3d at 1483. One is where the officer asks the questions on the basis of "'objectively reasonable articulable suspicion' of illegal activity." *United States v. Sanchez–Valderuten*, 11 F.3d 985, 989 (10th Cir.1993) (quoting *United States v.*

4. After the stop, Trooper Smith observed fast food wrappers and a bottle of "No–Doze" in the U–Haul's truck cab.

5. An officer asking a question, even if unrelated to the stop, does not by itself amount to a Fourth Amendment violation. *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir.1993). Questioning is not a seizure. *Florida v. Bostick*, 501 U.S. 429, 433–35, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389, 398 (1991). The second inquiry under *Terry* focuses on the lawful duration of the original detention. A valid initial stop can become unreasonable at some point. *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir.1989). "In a garden variety *Terry* stop, the nature of the questioning during a later portion of the detention may indicate that the justification for the original detention no longer supports its continuation." *Shabazz*, 993 F.2d at 436. If the questioning does not extend the duration of the original detention, there is no Fourth Amendment violation. *Id.* Consequently, questions asked while waiting for computer check results or completing necessary paperwork do not delay the stop beyond the time necessary to issue a citation. *See, e.g., Shabazz*, 993 F.2d at 437; *United States v. Walker*, 933 F.2d 812, 816 n. 2 (10th Cir.1991); *United States v. Morales–Zamora*, 914 F.2d 200, 203 (10th Cir.1990); *United States v. Torres*, No. 92–4061, 1993 WL 330616, unpub. op., 1993 U.S.App. LEXIS 22380 (10th Cir. Sep. 1, 1993).

*Soto,* 988 F.2d at 1554). The other is where the original detention has ended and the questioning is conducted during a consensual encounter. *United States v. McKneely,* 6 F.3d 1447, 1450–51 (10th Cir.1993). The government argues here only a consensual encounter.

 The Fourth Amendment does not bar an officer from questioning a motorist when the encounter is consensual. *United States v. Walker,* 933 F.2d at 817. The Tenth Circuit applies "a bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him." *United States v. Gonzalez–Lerma,* 14 F.3d at 1483 (citation omitted). In these circumstances, the rule is:

> Thus, "once the officer has returned the driver's license and registration in a routine traffic stop, questioning about drugs and weapons or a request for voluntary consent to search may be 'an ordinary consensual encounter between a private citizen and a law enforcement official' " so long as a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information.

*United States v. McKneely,* 6 F.3d at 1451 (quoting *United States v. Turner,* 928 F.2d 956, 958 (10th Cir.) (quoting *United States v. Werking* 915 F.2d 1404, 1408 (10th Cir.1990)), *cert. denied,* 502 U.S. 881, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991)). In simplest terms, a consensual encounter "occurs when a reasonable person in the defendant's position would feel free to leave." *United States v. Dewitt,* 946 F.2d 1497, 1502 (10th Cir.1991) (citations omitted), *cert. denied,* 502 U.S. 1118, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992); *see also United States v. McSwain,* 29 F.3d at 562 n. 1. The courts analyze all the circumstances to the encounter giving no single factor controlling effect. *United States v. Sandoval,* 29 F.3d at 540.

 The Tenth Circuit recently reversed a district court's finding of a consensual encounter on facts which resemble the instant case but which also diverge in two significant respects. In this court's judgment, the factual differences between them are enough to sustain the opposite result here. In *United States v. Sandoval,* 29 F.3d at 538–539, a state trooper pulled the defendant over for speeding. The trooper ran a license check and then asked the defendant to leave his vehicle and join the trooper in the patrol car. The trooper showed the defendant the radar reading, returned the defendant's documents, and handed him a warning citation. The defendant then asked: "That's it?" to which the trooper responded: "No, wait a minute." The trooper then proceeded to ask the defendant about his prior arrest for drugs and whether he was carrying any guns and drugs. The trooper then sought and received the defendant's permission to search the car.

On appeal, the Tenth Circuit found that the trooper's comment, "No, wait a minute," was in direct response to the defendant's question, "That's it?" and was intended to prevent the defendant from leaving the car so that the trooper could ask him questions. 29 F.3d at 541. As far as the objective impact of the trooper's response on a reasonable listener, the Tenth Circuit remarked that the response did not contemplate "any possibility of noncompliance on Sandoval's [defendant's] part, as when an officer inquires 'May I ask you a question?' " 29 F.3d at 541–42. To the Circuit panel, it logically followed that "[n]o one who is seated in a law enforcement officer's vehicle after having been stopped by the officer for a perfectly legitimate reason, and who then asks whether the stop is at an end ('That's it?') and is immediately told 'No' and to 'wait a minute,' can reasonably view himself or herself as free to leave the patrol car." 29 F.3d at 542.

Unlike the trooper in *Sandoval,* Trooper Smith conveyed to Hernandez that the citation process was over and that he could leave. Hernandez immediately reacted to Smith's comment, "That is all I have for you," by turning in his seat towards the patrol car door. This demonstrates that Hernandez understood he was free to leave.

Unlike the trooper's response and command in *Sandoval,* Trooper Smith's next comment, "Momento, could I ask you a few questions?", did not have the reasonable ef-

fect of taking away Hernandez's freedom to leave the patrol car. Smith's question plainly gives the defendant the opportunity to deny the trooper's request and to leave the patrol car. Hernandez should have understood that he had a choice as Trooper Smith did not ask any incriminating questions until Hernandez had given him permission to inquire further.

Thus, this case is distinguishable from *Sandoval* in two significant respects. First, a reasonable person would have understood Trooper Smith's comment, "That is all I have for you," as terminating the original investigative detention and as restoring his or her freedom to leave the patrol car and the scene. Second, a reasonable person would have understood Trooper Smith's question, "Momento, could I ask you a few questions?", as giving the person the choice to submit to additional questions or to leave the patrol car. For these reasons, the court concludes that the *Sandoval* holding, instead of requiring a finding of unreasonable detention, supports the finding of a consensual encounter here.

The totality of the circumstances demonstrate that a reasonable person in Hernandez's position would have believed he was free to leave. Trooper Smith had returned the documents to Hernandez and indicated the investigative detention was over. Before asking any additional incriminating questions, Smith asked for permission to talk further with Hernandez. The evidence of record does not indicate that Smith made any coercive showing of authority. Trooper Smith was the only officer present, and he did not display a weapon, physically touch Hernandez, use a commanding tone of voice as to suggest that the encounter was required and not voluntary. *See United States v. Turner*, 928 F.2d at 959.

**VOLUNTARY CONSENT TO SEARCH**

The defendant argues his consent was not voluntary as it was the product of an illegal detention. Although it finds no unreasonable detention, the court will proceed with considering the general issue of the voluntariness of Hernandez's consent giving special attention to Hernandez's limited ability to communicate in English.

A search authorized by consent is wholly valid and is a well-recognized exception to the prohibition against warrantless searches. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *United States v. Guglielmo*, 834 F.2d 866, 868 (10th Cir.1987). Before evidence from such a search is admitted, the court must find that the consent to search was voluntary and that the search did not exceed the scope of the consent. *United States v. Cody*, 7 F.3d 1523, 1526 (10th Cir. 1993); *United States v. Price*, 925 F.2d 1268, 1270 (10th Cir.1991).

The voluntariness of consent is a question of fact determined from the totality of the circumstances with the burden of proof resting on the government. *United States v. Price*, 925 F.2d at 1271. "[T]he government must: (a) present 'clear and positive testimony that consent was unequivocal and specific and freely given'; and (b) 'prove consent was given without duress or coercion, express or implied.'" *United States v. McKneely*, 6 F.3d at 1453 (quoting *United States v. Butler*, 966 F.2d 559, 562 (10th Cir.1992) (citation omitted)). The government must also prove that the consent was given without duress or coercion, express or implied. *United States v. Dewitt*, 946 F.2d at 1500 (quoting *United States v. Abbott*, 546 F.2d 883, 885 (10th Cir.1977)). As a general rule, the Tenth Circuit has found consent to search a vehicle voluntary where there is no evidence of coercion, the testimony establishes that consent was freely given and the occupant watched without voicing an objection as the officer searched the vehicle. *See, e.g., United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir. 1986).

There is no evidence of overt coercion by Trooper Smith. He was the only officer present, and he did not have his gun drawn, did not use an insisting or demanding tone or manner, did not physically harass the defendant, and did not use any threats or promises. He asked for consent only after receiving permission from Hernandez to talk with him. After exiting the patrol car, Hernandez did not suggest in any way that he was withdrawing his consent to search. Hernandez himself obtained the padlock keys

from the truck cab, unlocked the padlock, and opened the cargo doors. At no time during the search, did Hernandez voice any objection or question to Smith's search. The entire incident occurred on the shoulder of a public interstate highway. The court accepts as credible the trooper's testimony and finds that Hernandez voluntarily consented to the search.

■■ Hernandez also argues his poor English skills prevented him from understanding that he was being asked to consent to a search. Language barriers are relevant in evaluating the suspect's ability to act knowingly, intelligently, and voluntarily. *United States v. Heredia–Fernandez*, 756 F.2d 1412, 1415 (9th Cir.), *cert. denied*, 474 U.S. 836, 106 S.Ct. 110, 88 L.Ed.2d 90 (1985); *see United States v. Sanchez–Valderuten*, 11 F.3d at 990–91. The court can infer from the circumstances that Hernandez had fair receptive English language skills.[6] Hernandez responded appropriately to Trooper Smith's requests to produce his driver's license and the truck rental agreement and to accompany Smith to the patrol car. Hernandez was able to tell Trooper Smith what he did for living, where he was travelling, and what he was hauling. Trooper Smith asked Hernandez for consent to search in English, and Hernandez answered yes. Smith then had Hernandez read the request to search written in Spanish, and Hernandez gave the same affirmative response. Language is not a stumbling block when the suspect is advised of his rights also in a language that he ostensibly understands. *See, e.g., United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir.1987). Hernandez's actions indicate he knew that Trooper Smith had asked for consent to search. When asked to retrieve the keys, to unlock the padlock and to open the cargo doors, Hernandez did not express surprise or an objection. The evidence of record adequately demonstrates that Hernandez understood Smith's request to search and that Hernandez voluntarily consented to the search.

■■ Alternatively, Hernandez argues Trooper Smith's search of the packing boxes

exceeded the scope of any consent and was unlawful in lacking any exigent circumstances. Although an individual may limit consent to search to a particular area, if the individual instead gives a general consent then the search properly may include closed containers within the vehicle. *United States v. Santurio*, 29 F.3d 550, 553 (10th Cir.1994). The Tenth Circuit has held "that a failure to object to the continuation of a search indicates that the search was conducted within the scope of the consent given." *Id.* (citing *United States v. Nicholson*, 17 F.3d 1294 (10th Cir.1994); *United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir.1986)). Hernandez gave a general consent to search the truck and never objected during Trooper Smith's search of the packing boxes. Trooper Smith's search of the boxes was lawfully within the scope of the consent given.

■■ Assuming for the sake of argument that Smith lacked consent, once he smelled the strong odor of marijuana coming from the cargo area Smith had probable cause to search the entire truck and its contents that could conceal the marijuana. *United States v. Nicholson*, 17 F.3d 1294, 1297 (10th Cir. 1994). The automobile exception does not " 'depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.' " *United States v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir.1993) (quoting *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 3081, 73 L.Ed.2d 750 (1982) (per curiam)). "If police have probable cause to search a car, they need not get a search warrant first even if they have time and opportunity." *Ludwig*, 10 F.3d at 1528 (citation omitted). Hernandez's arguments on the lack of exigencies to justify searching the boxes are without merit.

**VOLUNTARY STATEMENTS**

In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custo-

---

**6.** *See supra* note 3.

dial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." For purposes of *Miranda*, interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980).

 A suspect who has been informed of his Miranda rights "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. The burden rests with the government to prove a valid waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168–69, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986); *U.S. v. Amos*, 984 F.2d 1067, 1074 (10th Cir.1993). A court may find a proper waiver "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).[7] In considering whether the confession or statement is one of free will, the courts look to several factors, including: the age, education, and intelligence of the defendant; the length of detention and questioning; whether *Miranda* warnings were given; the defendant's physical and mental characteristics; and the location of the questioning. *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir.1987), *cert. denied*, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988); *see United States v. Short*, 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied*, 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). "In no case, however, is any single factor determinative." *Chalan*, 812 F.2d at 1307. Once the defendant validly waives his Miranda rights, interrogation may continue until the defendant invokes his rights or changed circumstances suggest the responses have become involuntary. *United States v. Abreu*, 730 F.Supp. 1018, 1030 (D.Colo.1990), *aff'd*, 935 F.2d 1130 (10th Cir.), *cert. denied*, 502 U.S. 897, 112 S.Ct. 271, 116 L.Ed.2d 224 (1991).

 In deciding if the waiver was intelligent, the court looks at whether "the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him." *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir.1990) (citation omitted), *cert. denied*, 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991). The defendant need not appreciate "the tactical advantage of remaining silent" for the waiver to be intelligent. *Id.* The Supreme Court has "never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.'" *Connecticut v. Barrett*, 479 U.S. 523, 530, 107 S.Ct. 828, 832–33, 93 L.Ed.2d 920 (1987) (quoting *Oregon v. Elstad*, 470 U.S. 298, 316, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1985)).

 Trooper Smith provided Hernandez with *Miranda* warnings written in Spanish. Immediately after the arrest, Smith asked Hernandez to read these warnings aloud. Agent Walsh, who speaks Spanish, again provided the defendant with his *Miranda* warnings in Spanish. Hernandez followed along with a *Miranda* card written in Spanish and then signed the card. Hernandez appears to have understood the warnings and his waiver as evidenced by his signature on the written waiver form. Moreover, Hernandez later invoked his right to remain silent and to have counsel during his conversation with Agent Walsh. This subsequent invocation of rights establishes Hernandez's comprehension of his rights. The court finds that Hernandez voluntarily, intelligently, and knowingly waived his *Miranda* rights.

7. A court must satisfy itself of two things before finding a valid waiver of Miranda rights:

 "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."
 *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

IT IS THEREFORE ORDERED that the defendant's motions to suppress statements (Dk. 20) and to suppress evidence (Dk. 21) are denied.