PUBLISH

UNITED STATES COURT OF APPEALS
TENTH CIRCUIT

**Filed 8/30/96**

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

PABLO HERNANDEZ;
SULEIMA SILVA,

Defendants - Appellees.

No. 95-7177

Appeal from United States District Court
for the Eastern District of Oklahoma
(D.C. No. CR-95-65)

Richard A. Friedman, of the Department of Justice, of Washington, D.C. (John Raley, United States Attorney, and J. Michael Littlefield, Assistant United States Attorney, for the Eastern District of Oklahoma, with him on the brief), for the appellant.

Stephen J. Gruebel, Assistant Federal Public Defender (Stephen J. Knorr, Federal Public Defender, with him on the brief), of Tulsa, Oklahoma, for the appellee Pablo Hernandez.

Gene V. Primomo, of Wilcoxen, Wilcoxen & Primomo, of Muskogee, Oklahoma, for the appellee Suleima Silva.

Before HENRY, BRISCOE, and LUCERO, Circuit Judges.

BRISCOE, Circuit Judge.

This is an interlocutory appeal by the United States from the district court's order suppressing Suleima Silva's post-arrest statement and 28 bags of pseudoephedrine seized after a traffic stop of the car in which Silva and her husband, Pablo Hernandez, were traveling. We have jurisdiction over an interlocutory appeal from the granting of a motion to suppress pursuant to 18 U.S.C. § 3731. We reverse suppression of the statement and the drugs, and remand for further proceedings.

Dennis Flowers, an Oklahoma state trooper, stopped a car for speeding on Interstate 35 in Murray County, Oklahoma, in the early evening of September 26, 1995. Hernandez was driving the car and Silva was in the front passenger seat. Flowers asked Hernandez to sit in the front passenger seat of the patrol car while Flowers wrote a warning ticket and ran a license and registration check. The check revealed Hernandez had a valid California driver's license and that the car he was driving was registered to Adolpho Silva of Fresno, California.

When the check was completed, Flowers returned the license and registration to Hernandez and told him he was free to go. As Hernandez turned to get out of the car, Flowers inquired if he could ask him some more questions. Hernandez said "yes," and Flowers asked where he had been, where he was headed, and the purpose of the trip. Hernandez told Flowers he was returning to California after a visit with his wife's relatives in Dallas. Flowers asked if the passenger in the car was Hernandez' wife and was told that she was. He also asked her name. Flowers asked if there was luggage in the car and Hernandez stated there were no suitcases, only clothing. Flowers asked if there was any contraband in the car. Hernandez replied there was none, and consented to a search of the car. Flowers testified that he does not ask such questions in all traffic stops,

but asked the questions because the car was not registered to Hernandez and he wanted to check the possibility that the car was stolen, and he was "fishing."

When Flowers went to the passenger side of the car and spoke to Silva, he noticed a strong odor that he thought was laundry detergent, which from his training and experience he knew was frequently used to mask the odor of illegal drugs. Flowers asked Silva to get out of the car. Flowers then looked under the front passenger seat and noticed metal shavings near the bolts on the right front seat indicating they may have been recently turned. In response to a call from Flowers, another trooper arrived with a dog trained to detect illegal drugs by scent. The dog alerted to a purse that contained $1,800 in cash and to the area under the front passenger seat. A further search revealed 65 pounds of white powder packed in 28 bags in a hidden compartment under the seat, which was later identified as pseudoephedrine, an ingredient of methamphetamine.

Defendants were arrested and the next day Silva, who was 18 years old and spoke no English, was questioned by Tom Allen, a deputy sheriff. Allen did not speak Spanish and he asked an acquaintance, Jose Romo, to interpret. Romo had a third-grade education, had no training as an interpreter, had never acted as an interpreter, and did not read either Spanish or English very well.[1]

Silva was given a written Miranda warning in Spanish at the start of the interview. Romo testified that he watched her look at the form and she appeared to be reading it. Silva made an apparent reference to the document she was reading, saying "It also says

---

[1] We do not condone the state's employment of an interpreter with these inadequate credentials, particularly given the number of experienced, highly trained interpreters available. This case was made unnecessarily more difficult because a qualified interpreter was not initially retained to assist in Silva's interview.

here if, if I have the right to remain silent when they ask me a question." R III at 32-33. Romo testified that Silva told him she had one year of college education and could read. When Silva was first given the form, she was asked three times to read it aloud to Romo, but did not do so and responded, "All of it, everything?" Interrogation tr. at 2. Allen apparently gave up and asked Romo to translate an oral <u>Miranda</u> warning. Romo's translation was not perfect, but the transcript of the interview shows he advised Silva that she had the right to remain silent, that anything she said may be to her detriment and could be used against her "according to the law," that she had the right to "contract" an attorney before and during questioning, that an attorney would be provided if she could not afford one, and that she had the right to change her mind and not answer any questions. When asked if she understood her rights, Silva answered in the affirmative. Romo's translation of Allen's question of whether Silva waived her rights omitted the word "waive." He simply asked her if, with her rights, she was willing to answer questions. She responded with a question: "It also says here if, if I have the right to remain silent when they ask me a question?" Interrogation tr. at 6. Romo told her she had that right, but that Allen wanted to know if she was willing to answer his questions. "In other words, it's, it's up to you whether or not you want to answer any questions he asks you." Interrogation tr. at 7. Silva consented to answer questions.

Early in the interview, Silva admitted ownership of the car but denied knowledge of the drugs. She stated she had loaned the car to friends shortly before the trip, but would not provide their names. At a later point in the interview and after Silva had admitted that she owned the car, Allen told Silva the offense carried a possible life sentence and that, although he could make no promises, he would talk to the district

4

attorney if she cooperated. Romo embellished this statement, telling Silva she faced life without parole, without bail, and with no right to appeal. He also omitted Allen's statement that he could make no promises, telling her if she cooperated, Allen would talk to the district attorney "so that neither of you will end up so bad." Interrogation tr. at 14. Silva continued to deny any knowledge of the drugs, but gave some details of her trip with Hernandez from California to Texas.

Defendants were charged in federal court with possession of pseudoephedrine (18 U.S.C. § 841(d)(2)), interstate travel in aid of drug trafficking (18 U.S.C. § 1952(a)(3)), and conspiracy to possess pseudoephedrine (18 U.S.C. § 846). Defendants moved to suppress Silva's statement and the drugs. The only witnesses at the hearing on the motion to suppress were Flowers, another state trooper, Romo, and a professional translator who testified as an expert witness for the defense. Neither Hernandez nor Silva testified.

The district court granted the motion to suppress. The court concluded Hernandez was illegally detained without reasonable articulable suspicion when Flowers asked him questions about drugs and requested consent to search the car because Hernandez was inside the patrol car and believed he was not free to leave. The drugs were suppressed as the product of an illegal detention with the court ruling the consent to search was insufficient to purge the taint of the illegal detention. The court also concluded that Silva's statement was given while she was unlawfully confined because her arrest was the product of the illegal detention and search. The court ruled the <u>Miranda</u> warning and waiver were insufficient to purge the taint of the illegal arrest. Noting Romo's lack of qualifications as an interpreter, the imperfections in his translation, and the threat and promise he made to Silva, the court concluded the <u>Miranda</u> warning was inadequate and,

5

consequently, Silva's waiver of her Fifth Amendment rights was not sufficiently voluntary and intelligent to purge the taint of her illegal confinement.

## Standard of Review

When reviewing a district court decision on suppression of evidence, we must accept the court's findings of fact unless, viewing the evidence in the light most favorable to the court's findings, we conclude the findings were clearly erroneous. Evaluation of the credibility of witnesses, the weight to be given the evidence, and inferences to be drawn from the evidence are for the district court. However, the ultimate determination of whether a search and seizure were reasonable under the Fourth Amendment is subject to de novo review. United States v. Fernandez, 18 F.3d 874, 876 (10th Cir. 1994). See Ornelas v. United States, 1996 WL 276414 (May 28, 1996). Whether a seizure occurred is a question of law reviewed de novo. See United States v. McKneely, 6 F.3d 1447, 1451 (10th Cir. 1993).

## Was Hernandez illegally detained during questioning in patrol car?

Neither Hernandez nor Silva has challenged the validity of the initial stop. The district court's suppression of evidence was based on Flowers' questioning of Hernandez after completion of the license and registration check following a routine traffic stop for speeding.

If a license and registration check after a routine traffic stop reveals no reason to detain the driver, he or she must be permitted to proceed unless the officer has reasonable articulable suspicion of other crimes or the driver voluntarily consents to further questioning. See United States v. Sandoval, 29 F.3d 537, 539-40 (10th Cir. 1994). Here, after Flowers had completed the license and registration check, there was no evidence that

6

Flowers had any reasonable articulable suspicion that Hernandez was engaged in any illegal activity.

A traffic stop may become a consensual encounter if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority. See United States v. Werking, 915 F.2d 1404, 1408-09 (10th Cir. 1990). A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer. If the individual is free to leave at any time during the encounter, he or she is not seized under the Fourth Amendment. Whether an encounter is a detention or a consensual encounter depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter. Florida v. Bostick, 501 U.S. 429, 439 (1991); United States v. Little, 60 F.3d 708, 711 (10th Cir. 1995). A person is seized only when that person has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her way. Werking, 915 F.2d at 1408.

The district court found that after the license and registration check, Flowers returned Hernandez' documents to him and told him he was free to go. The court further found that, as Hernandez turned to get out of the patrol car, Flowers inquired if he could ask him a few questions. We reject Hernandez' argument that the court did not find these facts. Although the court questioned Flowers' credibility, the court's order states: "Trooper Flowers had given defendant Hernandez his warning citation, returned his driver's license, and told him he was free to go." Hernandez turned to get out of the patrol car but, at that point, while Hernandez was still in the patrol car, Flowers inquired if he

7

could ask him some more questions. When Hernandez said he could, Flowers began asking him additional questions.

The court concluded Hernandez was detained when Flowers inquired if he could ask some questions because Hernandez did not feel free to go and remained in the confines of the patrol car, where he was subjected to "interrogation-type" questions. We reject this conclusion because it focused upon Hernandez' subjective belief.

Hernandez' subjective belief that he was not free to go is not determinative. The correct test is whether a reasonable person in Hernandez' position would believe he was not free to leave. We conclude that a reasonable person would have believed he was free to leave. Flowers had returned Hernandez' license and registration and told him he was free to go. Hernandez must have believed he was free to leave at that point because the district court found he turned to get out of the car. Flowers, the only officer present, then inquired if he could ask some questions. There was no evidence that Flowers used a commanding or threatening manner or tone of voice, displayed a weapon, or touched Hernandez. See United States v. Ritchie, 35 F.3d 1477, 1481 (10th Cir. 1994); United States v. Turner, 928 F.2d 956, 959 (10th Cir.), cert. denied 502 U.S. 881 (1991).

Asking questions which may elicit incriminating answers is irrelevant to a determination of whether an encounter was consensual, although the manner in which the questions are asked is relevant; "accusatory, persistent, and intrusive" questioning may turn an otherwise voluntary encounter into a coercive one if it conveys the message that compliance is required. Little, 60 F.3d at 712. See Florida v. Bostick, 501 U.S. at 437. Here, Flowers testified that he asked Hernandez only a few questions. He asked where Hernandez had been, where he was going, the reason for the trip, whether his passenger

8

was his wife, his wife's name, and whether there was any luggage in the car before asking if there was any contraband in the car and if he could search the car. There was no evidence that Flowers' manner was accusatory, persistent, and intrusive.

Flowers' preliminary questions about Hernandez' destination and his relationship to his passenger were routine questions like those held not to be coercive in United States v. Zapata, 997 F.2d 751, 754, 758 (10th Cir. 1993). Such questions may be asked as a matter of course without exceeding the proper scope of a traffic stop. See, e.g., United States v. Gonzalez-Lerma, 14 F.3d 1479, 1484 (10th Cir.), cert. denied 114 S. Ct. 1862 (1994); Turner, 928 F.2d at 958-59. A limited number of routine questions about travel plans and relationship to passengers, followed by a question about possession of contraband and a request to search, are not sufficient to render an otherwise consensual encounter coercive.

The questioning was not the kind of accusatory, persistent, and intrusive questioning that was held coercive in Little, 60 F.3d 708. In Little, a DEA agent, in effect, told a train passenger that he suspected her of carrying drugs. After she refused to permit a search of the bag in her compartment, he asked her to accompany him to the baggage compartment where he asked if she had packed her checked bag herself and knew what was in the bag. United States v. Little, 18 F.3d 1499, 1501-02 (10th Cir. 1994).

The fact that the questioning here took place in the patrol car is not enough to turn further questioning into a detention. Although questioning in a confined space out of public view is relevant to whether an encounter is detention, that fact alone is not determinative. See Little, 60 F.3d at 712, citing Florida v. Bostick, 501 U.S. at 437.

9

In United States v. Deases, 918 F.2d 118, 120-22 (10th Cir. 1990), cert. denied 501 U.S. 1233 (1991), a trooper asked a driver to sit in the patrol car during a traffic stop. After returning the driver's license and while both were still sitting in the patrol car, the trooper asked the driver if he had any drugs or other contraband and if he would permit a search of the car. The court held the duration of the detention was not excessive because the trooper had returned the driver's documents before asking about drugs, implicitly determining the detention ended with the return of the documents even though the driver was inside the patrol car. See United States v. Rivera, 906 F.2d 319, 320-23 (7th Cir. 1990) (questioning of defendant while seated in patrol car did not exceed legitimate duration and scope of traffic stop; detention ended before questioning when trooper returned documents and told driver "that was it"); United States v. Hernandez, 893 F. Supp. 952, 959-60 (D. Kan. 1995) (defendant sitting in patrol car no longer detained after ticket issued, documents returned, and officer told defendant, "That is all I have for you," before inquiring if he could ask defendant a few more questions). Cf. Little, 60 F.3d at 712 (questioning train passenger in confined baggage area out of public view not consensual because of accusative, persistent, and intrusive nature of questions and failure to advise passenger she could refuse to go to baggage area); United States v. Ramos, 42 F.3d 1160, 1161-63 (8th Cir. 1994) (driver of stopped truck detained after trooper returned driver's license but asked defendant to remain in patrol car), cert. denied 115 S. Ct. 2015 (1995); Sandoval, 29 F.3d at 540-42 (driver of stopped truck detained in police car after return of license and registration when driver asked "That's it?" and trooper told him to "wait a minute").

**Was consent to search voluntary?**

Because we conclude that Hernandez was not detained during the questioning, his consent to search was not the result of an illegal seizure. It is not required that the consent satisfy the higher standard of voluntariness necessary to validate a consent to search given after an unlawful detention. See United States v. McCurdy, 40 F.3d 1111, 1119 (10th Cir. 1994); Deases, 918 F.2d at 122 n.1. The district court, therefore, applied the wrong legal standard to the consent to search in this instance.

Whether a consent to search that does not follow a Fourth Amendment violation was voluntary is a question of fact to be determined from the totality of the circumstances. The government bears the burden of proving the consent was voluntary. The government must show there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given. McCurdy, 40 F.3d at 1119; United States v. Sanchez-Valderuten, 11 F.3d 985, 990 (10th Cir. 1993). In making this determination, the court should not presume the consent was either voluntary or involuntary. United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993). Because the court did not apply this standard, its findings of fact are based on an erroneous interpretation of law. Remand is appropriate unless the record is such that only one resolution of the factual issues is possible. See Little, 18 F.3d at 1503.

We conclude that the record permits only one resolution of the issue. There was no evidence of any duress or coercion by Flowers. To the contrary, the district court found that Flowers told Hernandez he was free to go and returned his documents before inquiring if he could ask some questions. There was no evidence of physical mistreatment, violence, threats, promises or inducements, deception or trickery, display of

11

a weapon, use of a commanding manner or tone of voice, or the presence of more than one officer. See McCurdy, 40 F.3d at 1119; Sanchez-Valderuten, 11 F.3d at 990. A consent to search is not invalid merely because it is given by a person detained in a police car. See Ramos, 42 F.3d at 1164; United States v. Quinones-Sandoval, 943 F.2d 771, 775 (7th Cir. 1991). Nor is a consent given inside a police car when the person is not detained invalid. See Hernandez, 894 F. Supp. at 960-61.

The district court found that Hernandez consented to a search of the car. There was no evidence of any physical or mental incapacity on the part of Hernandez. See McCurdy, 40 F.3d at 1119. There is nothing in the record to suggest that Hernandez' consent was not freely and intelligently given.

### Did the district court err in suppressing Silva's statement?

We note at the outset that Silva did not confess to any criminal act during questioning. The government acknowledged at oral argument that a confession is not at issue here. The government appeals the suppression of Silva's statement because, as a part of her statement, she admitted that she owned the car. The government argues this evidence is necessary in its prosecution of Hernandez and Silva and this evidence is not obtainable through other means.

The district court ruled that Silva's statement was the product of Flowers' questioning of Hernandez and the search of the car, and concluded the Miranda warning and Silva's waiver of her Fifth Amendment rights were insufficient to purge the taint of the unlawful detention and search. The court based its conclusion on Romo's imperfect translation of Allen's oral Miranda warning, his embellishment of Allen's questions to include threats and promises to Silva, pauses and answers by Silva that the defense expert

12

witness thought could indicate confusion or lack of understanding, and lack of evidence that Silva could read.

By requiring the government to prove Silva's Miranda waiver and statement were acts of free will sufficient to purge the taint of an illegal search and arrest, the district court applied the wrong legal standard. Because the questioning of Hernandez and the search of the car were not unlawful, Silva's arrest was not unlawful and there was no taint of illegality to be purged. The court should have applied the ordinary standards for determining the voluntariness of Silva's waiver. Notions of "free will" are not relevant to this determination. What is at issue is whether the waiver was the result of police overreaching. See Colorado v. Connelly, 479 U.S. 157, 169-70 (1986). To establish a waiver of Fifth Amendment rights, the government must show (1) that the waiver was voluntary in the sense that it was a product of free and deliberate choice rather than intimidation, coercion, or deception; and (2) that the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving. Only if the totality of the circumstances surrounding the interrogation shows both an uncoerced choice and the requisite level of comprehension can a waiver be effective. Colorado v. Connelly, 479 U.S. at 168; United States v. March, 999 F.2d 456, 460 (10th Cir.), cert. denied 114 S. Ct. 483 (1993).

In reviewing a decision on a motion to suppress a confession or a statement, the district court's underlying findings of fact must be accepted by the appellate court unless they are clearly erroneous. United States v. Muniz, 1 F.3d 1018, 1021 (10th Cir.), cert. denied 114 S. Ct. 575 (1993). The ultimate question of whether a statement was voluntary is a question of law reviewed de novo. United States v. Perdue, 8 F.3d 1455,

13

1462 (10th Cir. 1993). See Miller v. Fenton, 474 U.S. 104, 110 (1985). In Miller, the court held the voluntariness of a statement or confession is "a legal question requiring independent *federal* determination" (emphasis added); consequently, a state court's determination of voluntariness is not deferred to as a finding of fact, but is subject to full review as a conclusion of law. 474 U.S. at 110. The same standard applies to determinations of the voluntariness of a statement and of a waiver of Fifth Amendment rights. See Colorado v. Connelly, 479 U.S. at 168-69; United States v. Amos, 984 F.2d 1067, 1074 (10th Cir. 1993). Consequently, the same standard of appellate review should apply to both. But see United States v. Johnson, 42 F.3d 1312, 1318 (10th Cir. 1994), cert. denied 115 S. Ct. 1439 (1995); United States v. Hernandez, 913 F.2d 1506, 1509 (10th Cir. 1990), cert. denied 499 U.S. 908 (1991). We note both Johnson and Hernandez misquote Miller v. Fenton as stating that voluntariness is a "legal question requiring independent *factual* determination," (emphasis added) and proceed from that incorrect premise to conclude that voluntariness of a waiver is a question of fact. Whether the language of a particular Miranda warning was adequate is reviewed de novo. See United States v. Soria-Garcia, 947 F.2d 900, 902 n. 1 (10th Cir. 1991).

## Was the Miranda warning adequate?

The district court's conclusion that Romo's translation of the Miranda warning was inadequate is erroneous. It is true that Romo's translation was imperfect. However, warnings that convey the substance of the suspect's rights are sufficient. See Duckworth v. Eagan, 492 U.S. 195, 210-15 (1989). A translation of a suspect's Miranda rights need not be perfect if the defendant understands that he or she need not speak to the police, that any statement made may be used against him or her, that he or she has a right to an

14

attorney, and that an attorney will be appointed if he or she cannot afford one.  See Soria-Garcia, 947 F.2d at 901-03; Hernandez, 913 F.2d at 1510.

Romo's translation was sufficient to convey the essence of the Miranda warning to Silva--that she had the right to remain silent, that anything she said could be used against her, that she had the right to an attorney during questioning, and that an attorney would be provided if she could not afford one.  Silva was also advised that she had the right to change her mind and not answer any questions.  Moreover, there was evidence that Silva was given an accurate written Spanish version of the Miranda warning.  The district court's finding that there was no evidence that Silva could read is clearly erroneous.  Romo testified that he watched her read the written warning and she told him she had one year of college.  The transcript of the interview clearly shows she could read because she referred to a document in front of her, saying "It also says here . . . ."  We conclude the oral and written Miranda warnings were adequate.

### Did Silva understand her rights?

In ruling that Silva's waiver and statement were insufficient acts of free will to purge the taint of an illegal arrest, the district court noted the defense expert witness on Spanish-English translation testified that pauses and nonresponsive answers by Silva indicated she could have been confused or lacked understanding of the questions.  However, the witness also testified that the pauses could have indicated Silva was reading something, and in the transcript of the taped interview Silva clearly referred to the written warning she was reading.

As discussed above, Romo provided a constitutionally adequate Miranda warning in Spanish.  Silva's two questions or comments during the Miranda advisement did not

15

show that she failed to understand the words used by Romo. Moreover, they resulted in further explanation of her basic Fifth Amendment rights. Silva repeatedly answered affirmatively when asked if she understood each right explained to her. The court did not find that Silva did not understand what Romo told her. The court's ruling was based on imperfections in Romo's translation rather than on Silva's subjective understanding of Romo's words.

The expert witness did not identify which of Silva's answers she considered not directly responsive to questions. The only answers that could reasonably be characterized as nonresponsive were made during the substantive questioning <u>after</u> the <u>Miranda</u> advisement and cannot establish lack of understanding of the prior advisement. In any case, to the extent some of Silva's answers were not directly responsive, this is more reasonably attributed to evasiveness than to a lack of understanding of her rights under <u>Miranda</u>. Silva continued to deny any knowledge of the drugs throughout the interview and would not give the names of friends whom she said had borrowed her car.

Although Silva was only 18 years old and spoke no English, Romo's translation was adequate and there was no evidence that Silva had limited intelligence or education. There was evidence she had one year of college. The record establishes that her rights were adequately explained to her and that she understood those rights, and there was no indication she did not understand what Romo told her. We conclude the record permits only one conclusion--that Silva understood the <u>Miranda</u> advisement.

**Was the waiver voluntary?**

When Allen asked if Silva would waive her rights and answer questions, Romo did not translate "waive," but asked "With your rights, are you willing to answer any

16

questions he asks you?" Silva replied, "It also says here if, if I have the right to remain silent when they ask me a question." Romo told her yes, and then translated: "You do have that right. But he also wants to know if you are willing to answer any questions he asks you. Yes or no?" Romo then added: "In other words, it's, it's, it's up to you whether or not you want to answer any questions he asks you." Silva then agreed to answer questions.

Romo's failure to translate "waive" did not invalidate the waiver. See Oregon v. Elstad, 470 U.S. 298, 315 n. 4 (1985) (approving question, "Having these rights in mind, do you wish to talk to us now?") Romo's explanation to Silva that she had the right to remain silent but could choose to speak to Allen if she wished was the equivalent of asking her if she waived her rights. Her response that she would answer questions was an express waiver, which is strong proof that the waiver was valid. See North Carolina v. Butler, 441 U.S. 369, 373 (1979); Amos, 984 F.2d at 1074.

At the start of the advisement, after being told she had the right to remain silent, Silva apparently tried to ask a question, saying "If I want to talk," but was cut off by Romo, who said "No." However, Romo then explained that she should answer only with yes or no. "No details or anything. You are only going to say yes or no. Because on that form it says [ui] it says that you have the right to stay, remain silent, right? And anything you say may be to your detriment." Interrogation tr. at 3. Silva then indicated that she understood. Romo's explanation limited any coercive effect of cutting off Silva's question. In effect, he cut her off to prevent her from making a statement before completion of the Miranda warning. Romo adequately explained her basic rights, which is all that is required. A defendant need not be advised of every possible consequence of

17

a waiver of the Fifth Amendment privilege. See Colorado v. Spring , 479 U.S. 564, 574-77 (1987).

During the interview, Allen told Romo to tell Silva she faced a possible life sentence (Okla. Stat. Ann. 63, § 2-401) and that, while he could make no promises, he would inform the district attorney if she cooperated. However, Romo embellished the statement by telling Silva she faced possible life without parole, without bail, and without the right to appeal if she did not cooperate. Because Romo did not translate the deputy's disclaimer that he could make no promises, Romo's translation could reasonably be construed as a promise of favorable treatment if she cooperated.

It is true that a defendant's statement that is extracted or induced by threats or promises is involuntary. See Hutto v. Ross, 429 U.S. 28, 30 (1976); Griffin v. Strong, 983 F.2d 1540, 1542 (10th Cir. 1993). However, the district court's finding that Romo made these threats and promises during advisement of Miranda rights is clearly erroneous. Romo made the threats and promises during the substantive portion of the interview, after the Miranda advisement and waiver and after Silva had admitted ownership of the car. Romo's statements could not have coerced or induced Silva's prior waiver and statements.

We conclude that the factors cited by the district court in support of its conclusion that the waiver was insufficiently an act of free will to purge the taint of an illegal arrest do not establish the waiver was involuntary. We further conclude that the record permits only one conclusion--that the waiver was voluntary. There was no evidence of any coercion during the advisement or during the substantive questioning until the threat and promise were made by Romo, and that threat did not induce a confession or an

18

incriminating statement.  The detention and questioning were not prolonged, there was no evidence of physical punishment or threats of physical punishment, and an adequate <u>Miranda</u> warning was given.  There was no evidence that Silva had limited intelligence or education.

Whether the statement itself, rather than the waiver, was voluntary was not at issue before the district court, and it has not been raised in the briefs on appeal.  Accordingly, we do not address that issue.

## Conclusion

The order suppressing Silva's statement and the drugs found in the car is REVERSED, and this case is REMANDED for further proceedings.

**LUCERO**, Circuit Judge, concurring in part and dissenting in part:

I agree that defendant Hernandez was not illegally detained, and that he voluntarily consented to the search of the car. However, I disagree with the majority's analysis concerning defendant Silva. Because I do not conclude that Silva voluntarily waived her Miranda rights, I would affirm the district court's order with respect to her.[2]

As the majority points out, it is the government's burden to demonstrate the defendant's full awareness of her rights and the consequences of waiving them, as well as the voluntariness of that waiver. Despite the obvious and grave shortcomings of the translation in this case, I am convinced that the Miranda warning given here sufficiently informed Silva of her rights. However, I do not think the government has sufficiently demonstrated that her waiver of these rights was voluntary.

A voluntary waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986). Our review of whether a waiver is voluntary is de novo. United States v. Perdue, 8 F.3d 1455, 1466 (10th Cir. 1993). Upon a careful reading of the interrogation during which Silva allegedly waived her rights, I conclude that Silva's choice was a far cry from "free and deliberate." After explaining her rights to Silva through an interpreter, Deputy Sheriff Allen sought her waiver. She declined to give it, instead asserting -- or at least, inquiring about -- whether she could decline to answer his inquiries:

---

[2] The government acknowledged at oral argument that Silva did not confess to any crime. It seeks to overturn the district court's suppression order because it claims to have no evidence, aside from Silva's admission during interrogation, that she is the owner of the car in question.

Allen:          OK.  With her rights in mind, will she waive them and talk to me?  I, I would like to ask her some questions.  With her rights in mind, will she waive her rights and talk to me?

Translator:    [With your rights, are you willing to answer any questions he asks you?]

Silva:          [It also says here if, if I have the right to remain silent when they ask me a question.]

Translator:    [Yes.]

Interrogation tr. at 6 (bracketed portions translated from Spanish).  At this point, Silva had not yet waived her rights.  Next, Allen tried again to persuade Silva to answer his questions -- this time without asking her to waive her rights.  Silva's answer was ambiguous:

Allen:          What'd she say?

Translator:    She asked to me, there's on the page where it says that she has the rights to remain silent.

Allen:          Tell her she has that right.  I'm just asking her if she will talk to me, that, that I just want to ask her some questions.

Translator:    [You do have that right.  But he also wants to know if you are willing to answer any questions he asks you.  Yes or no?  In other words, it's, it's, it's up to you whether or not you want to answer any questions he asks you.]

Silva:          [Yes.]

Interrogation tr. at 6-7.  It is unclear whether Silva's "Sí" was an indication of understanding, or an agreement to answer some questions.  Whichever be the case, it appears coercive, or at least confusing, to acknowledge Silva's right to remain silent but

2

to follow that acknowledgment with, "[b]ut he also wants to know if you are willing to answer any questions...," as if there were no contradiction there.  But this presented no concern for the translator.  In the very next question -- which he asked on his own, without benefit of inquiry from Allen -- the translator proposed to resolve any ambiguity by inventing an answer for Silva when she in fact gave none.  The soliloquy:

> Translator:    [You are willing to answer them?]  She's, she's willing to answer whatever your questions are.
>
> Allen:          OK.  Uh.  The, uh, first thing, ask her...

Interrogation tr. at 7.

The evidence below supported the district court's conclusion that the translation was inadequate.  Clearly, qualified interpreters were available in Oklahoma: an interpreter from a Tulsa translation firm testified at trial, and Romo's own wife was a Spanish teacher.  In contrast, Romo had never before served as an interpreter, had only a third grade education and spoke neither English nor Spanish well.  Significantly, as the majority notes, Romo mistranslated the word "waive" the one time Allen used it.  At trial, he admitted that he did not know the meaning of the word "waiver."  When asked how, then, he could translate it he replied, "[w]hen you are talking, it depends on the conversation that you are on, is the way you -- because I don't have any education, so I have to put -- fix in words to try to make it come out right."  Trial tr. at 76.[3]

---

[3] Romo violated the ethical rules applicable to interpreters in the courtroom.  See Model Code of Professional Responsibilities for Interpreters in the Judiciary Canons 3, 7, reprinted in 1 Harv. Latino L. Rev. 148, 152, 155 (1994) ("Interpreters shall be impartial and unbiased and shall refrain from conduct that may give an appearance of bias"; "Interpreters shall limit themselves to interpreting . . . and shall not give legal advice, express personal opinions [etc.] . . . ."); see also 28 U.S.C. § 1827 (requiring certification of courtroom interpreters).  While the exigencies of the moment often dictate that

3

The district court concluded that Silva's purported waiver did not pass constitutional scrutiny, characterizing it as:

> an attempted waiver of <u>Miranda</u> rights by an uneducated, unqualified interpreter who, from the evidence, did not know the English meaning of some of the words used by the officer interrogator, added his own, sometimes incorrect, interpretation of what was asked and answered, and promised the defendant favorable treatment and threatened incorrect, severe punishment for her failure to cooperate. The court finds that this use of an unqualified interpreter was purposeful, unlawful, and evinced a flagrant disregard for the rights of defendant Silva.

Dt. Ct. order at 8-9. It is unnecessary to reach whether the choice of an unqualified translator was "purposeful." Purposeful or not, the inaccurate and manipulative nature of the interrogation causes me to conclude Silva's asserted waiver was not voluntary. Accordingly, while I would REVERSE as to the district court's determinations regarding Hernandez, I would AFFIRM its suppression of Silva's testimony on the grounds that it was given pursuant to an involuntary waiver of her rights.

---

authorities settle for less outside of court than is required in court, it does not follow that outside of court, any interpretation will do. Under any standard, the use of an uneducated and inexperienced translator who took an active role in encouraging Silva to cooperate was inadequate.

4