**F I L E D**

**UNITED STATES COURT OF APPEALS**

APR 8 2005

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

EDGAR LUNA-SANTANA,

Defendant-Appellant.

No. 03-8103
(District of Wyoming)
(D.C. No. 02-CR-204-D)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **MURPHY**, and **McCONNELL**, Circuit Judges.

## I. INTRODUCTION

Defendant-appellant Edgar Luna-Santana was convicted by a jury of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and possessing a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). Luna-Santana is appealing the denial

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

of his motion to suppress evidence obtained during the search of his vehicle and the denial of his motion for a mistrial based upon a statement made by the prosecutor during closing arguments. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we **affirm** the judgment of the district court.

## II. BACKGROUND

On July 15, 2002, the Wyoming Highway Patrol received a REDDI report (Report Every Drunk Driver Immediately)[1] that a white Chevrolet Tahoe bearing Nevada license plates and containing four individuals who appeared to be intoxicated had just left the Flying J Truck Stop located in Carbon County, Wyoming.

Trooper Dave Motsick was just finishing another traffic stop when he spotted a white Chevy Tahoe fitting the REDDI description traveling in the eastbound lane of I-80. Motsick began following the white Chevy Tahoe and observed the driver of the truck violate a no-passing zone. Motsick continued to follow the vehicle until it exited a construction zone at milepost 228, which is commonly known as the Fort Steele rest area. At that point, Trooper Motsick initiated a traffic stop.[2] Motsick spoke to the driver, later identified as Rodrigo

---

[1]Trooper Dave Motsick testified at the suppression hearing that a REDDI report usually is a tip from an unknown source that someone may be under the influence while driving.

[2]The entire encounter was video-recorded and the tape was admitted into

(continued...)

Quintero, who told Motsick that he did not have a driver's license and that the vehicle was owned by Luna-Santana, who was sitting in the front passenger seat. Luna-Santana handed Quintero the vehicle's registration and proof of insurance. There were two other passengers seated in the rear of the vehicle.

Motsick observed a strong odor of alcohol coming from the vehicle and asked Quintero to exit the vehicle. Motsick conducted a horizontal gaze nystagmus test and a preliminary breath test. After concluding Quintero was not under the influence of alcohol, Motsick issued him a warning for passing in a no-passing zone and wrote him a citation for driving without a valid driver's license. While writing out the citation, Motsick asked Quintero where they were coming from and where they were going. Quintero told Motsick that they left Wendover, Nevada, at three o'clock in the morning and were going to Denver to see a cousin of Luna-Santana's.

After issuing the citation, returning the insurance and registration forms, and telling Quintero he was free to leave, Motsick inquired if he could ask some

---

[2](...continued)
evidence before the district court. The district court, therefore, had an opportunity to view the tape. The tape was not designated as part of the record on appeal, although defense counsel provided his own elaborate transcript of the tape. This does not affect our review of the record because the district court, independent of the video-recording, relied on testimony from the suppression hearing.

additional questions. Quintero agreed. Motsick asked if there were any illegal narcotics in the car and Quintero said no. Motsick then asked Quintero if there were any illegal weapons in the vehicle and Quintero again said no. Motsick asked if they had any large sums of money in the vehicle and Quintero stated that Luna-Santana had about a thousand dollars in cash that Luna-Santana had received from tips. Motsick asked Quintero for permission to search the vehicle and Quintero said, "Sure, that's fine."

While Motsick was questioning Quintero, Troopers Nicholas Bisceglia and Jay Scheel arrived on the scene. Motsick asked Bisceglia and Scheel to identify the other individuals in the vehicle because he was not sure they had their seat belts on at the time of the stop. Motsick also asked Bisceglia, who had received some training in Spanish, to ask Luna-Santana for consent to search the vehicle. Bisceglia asked Luna-Santana to come to the rear of the vehicle where Bisceglia spoke with Luna-Santana in English and Spanish. After reading the consent to search form in Spanish, Luna-Santana stated that he did not want to sign any forms but the officers were free to search the vehicle. Trooper Bisceglia recalled Luna-Santana saying, "Just go ahead. I'm not signing it but just go ahead and search. Go ahead." The troopers observed that Luna-Santana was under the influence of alcohol. Luna-Santana testified that at that time of the stop he was highly intoxicated and consented to the search because he thought the officer was

going to check the vehicle "real quick" and then let them go to the bathroom. Luna-Santana also testified that he did not understand what the officer was asking of him because he does not speak English very well.

After the other passengers got out of the car, Motsick and Scheel began searching the vehicle while Bisceglia stayed with Luna-Santana and the other passengers. At some point Luna-Santana asked to use the restroom and was told to urinate on the side of the road.

During the search Scheel found a glass pipe in the back seat of the vehicle that was about eight to ten inches long with a bowl on one end and a hole in the top. Based on his experience, Motsick recognized the pipe, which had white residue and burn marks on it, as illegal drug paraphernalia used to smoke methamphetamine and marijuana. The troopers also identified two other items as suspicious. A map case in the center console near the floorboard in between the front seats would not open, and a red button located near the bottom of the floorboard on the driver's side of the vehicle did not appear to be a standard piece of equipment. The troopers traced the wiring to and from the button, but were unable to determine its function. The troopers suspected the vehicle contained a concealed compartment.

After identifying these suspicious items, the troopers asked the occupants of the vehicle who owned the pipe and no one claimed ownership. At that point

the troopers placed all four individuals under arrest. The troopers patted down the individuals and placed them in handcuffs. The troopers then transported the occupants to the Wyoming Department of Transportation ("WYDOT") building in Rawlins. Prior to departing for Rawlins, however, Quintero admitted to the officers that he owned the glass pipe and said he had smoked all the drugs.

Motsick contacted Trooper Jason Green, a canine officer, who met the other troopers at the WYDOT building with his dog. Motsick asked Green to conduct a search of the vehicle using his canine. The dog alerted to the passenger side of the vehicle near the glove box. A secret compartment in the airbag area of the vehicle was located. In the compartment, officers located a plastic bag containing hot chili peppers and two separately packaged bundles of cocaine (approximately eighty-four grams). Next to the cocaine, the agents seized a loaded nine-millimeter Beretta handgun. At no time did any of the vehicle's occupants, including Luna-Santana, object to the search.

After the officers had found the gun and the drugs, Special Agent Chuck Davis of the Wyoming Attorney General's Office, Division of Criminal Investigation, and Officer Sergio Mariani with the Saratoga Police Department conducted a custodial interview with Luna-Santana. Special Agent Davis *Mirandized* Luna-Santana in English; Davis then had Mariani advise Luna-Santana of his *Miranda* rights in Spanish. Luna-Santana told Davis that he did

not want to sign any forms, such as the waiver of rights form, but he agreed to talk to the officers. In the interview, which was conducted in English, Luna-Santana told Davis that the cocaine and handgun in the vehicle belonged to him and that he had killed three people. Luna-Santana later changed his story, stating that he had not killed anyone and that he did not know anything about the cocaine, the handgun, or any hidden compartments in the vehicle. During the interview, Luna-Santana began to cry and told the officers he was very depressed. At one point Luna-Santana leaned forward in his chair and said to Davis, "Would you take me out and kill me?"

Luna-Santana was charged with possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count 1), and possessing a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 2). Luna-Santana filed a motion to suppress the evidence seized from the vehicle and his statements made after his arrest. Defense counsel also moved to have Luna-Santana examined as to his competency. The district court granted the motion to have Luna-Santana examined and continued the jury trial. Luna-Santana was found to be competent. The parties entered into a plea agreement, but the guilty plea was never entered as Luna-Santana advised the court that he wanted to proceed to trial.

Troopers Motsick and Bisceglia and Special Agent Davis testified at the suppression hearing. Luna-Santana and Oscar Aguirre, a co-worker of Luna-Santana's and fellow occupant of the Chevy Tahoe, also testified at the hearing through interpreters. The district court denied Luna-Santana's motion to suppress. The court concluded that the initial traffic stop was reasonable and justified. The court further found that after completing the routine traffic stop, Trooper Motsick informed Quintero he was free to leave and then obtained knowing and voluntary consent to search the vehicle from both Quintero and Luna-Santana. The entire encounter, the court concluded, was consensual. The district court then determined that discovery of the glass methamphetamine pipe containing a white residue gave the officers probable cause to arrest the occupants of the vehicle and to search the entire vehicle. Therefore, the court concluded there was no unlawful search.

The case against Luna-Santana proceeded to trial and after the jury convicted Luna-Santana of both counts, the district court sentenced him to twenty-one months' imprisonment on Count 1 and sixty months' imprisonment on Count 2, to be served consecutively. Luna-Santana filed a timely notice of appeal and now challenges the district court's denial of his motion to suppress the evidence seized from his vehicle and the denial of his motion for a mistrial made in response to a statement of the prosecutor during closing arguments.

## III.  DISCUSSION

### A. Search of the Vehicle

Luna-Santana contends that the district court erred when it upheld the validity of the search of the Chevy Tahoe.  Luna-Santana argues that his consent to search was not voluntary because he was not competent to voluntarily give consent and that he was extremely intoxicated at the time.  Luna-Santana further contends that, regardless of the voluntariness of his initial consent, he subsequently either revoked his consent to search or the coercive conduct of the officers converted what was otherwise a consensual encounter into an illegal detention.

"When reviewing a district court's decision on suppression of evidence, we must accept the court's findings of fact unless, viewing the evidence in the light most favorable to the court's findings, we conclude the findings were clearly erroneous."  *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996).  "The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court."  *United States v. Long*, 176 F.3d 1304, 1307 (10th Cir. 1999).  The ultimate determination of reasonableness under the Fourth Amendment is a question of law reviewed *de novo*.  *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000).

Luna-Santana does not dispute, nor could he, the legitimacy of the initial traffic stop. *See United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001) (noting that "[a] traffic stop is reasonable under the Fourth Amendment if the officer has . . . probable cause to believe a traffic violation has occurred" (quotation omitted)).[3] After the completion of a routine traffic stop, such as that which occurred in the instant case, an officer must allow the occupants of a vehicle to proceed unless the officer has "reasonable articulable suspicion of other crimes or the driver voluntarily consents to further questioning." *Hernandez*, 93 F.3d at 1498. It is not disputed that the driver consented to additional questioning by Trooper Motsick. Nor is it disputed that Luna-Santana consented to a search of his vehicle. Luna-Santana also does not contend that he was illegally detained or seized at the time the troopers sought consent to search. Luna-Santana does, however, dispute the voluntariness of his consent to search.

Whether the consent to search was voluntary is a question of fact determined from the totality of the circumstances. *West*, 219 F.3d at 1177. We review the district court's determination of voluntariness for clear error. *Id.* In concluding that Luna-Santana's consent to search was voluntary, the district court found that the troopers asked for consent in both English and Spanish and that the

[3]Driving on the left side of the roadway within a no-passing zone is a violation of Wyoming law. Wyo. Stat. Ann. § 31-5-207(b).

-10-

"actions and posture of the troopers were in no way coercive or aggressive."

Indeed, Luna-Santana does not allege any "physical mistreatment, violence,

threats, promises or inducements, deception or trickery, display of a weapon, [or]

use of a commanding manner or tone of voice." *Hernandez*, 93 F.3d at 1500.

That Luna-Santana was intoxicated, not a native English speaker, or for some

other reason of limited ability to understand are all factors to be considered in the

determination of voluntariness. *See, e.g.*, *United States v. Contreras*, 372 F.3d

974, 977 (8th Cir. 2004) (noting the variety of factors to be considered). The

district court found, however, that Luna-Santana's responses to the officers were

"lucid and coherent" and the voluntariness of his consent was not affected by his

being under the influence of alcohol. This finding is not clearly erroneous.

Although it is evident from the record that Luna-Santana had been drinking and

may not have been completely lucid, the record also shows that he understood

what the officers were asking of him and voluntarily consented to the search of

his vehicle. *See United States v. Gay*, 774 F.2d 368, 377 (10th Cir. 1985) ("[O]ne

must know he is giving consent for the consent to be efficacious."). The record

shows that Luna-Santana rationally conversed with the troopers, providing verbal

consent while declining to sign the consent to search form. In addition, Luna-

Santana admitted on cross-examination that he knew what he was doing when the

officer asked for consent to search the vehicle. We therefore find nothing in the

record to indicate that the district court erred in finding that Luna-Santana voluntarily consented to the search of his vehicle.

Nor is there any evidence in the record to suggest that Luna-Santana revoked his consent or in any way objected to or clarified the scope of the consent to search. "The general rule is that where a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle." *West*, 219 F.3d at 1177 (quotation omitted). There is no evidence in the record that Luna-Santana objected to or expressed concern about the troopers' activities or that he attempted to limit or retract his consent. *See United States v. Pena*, 920 F.2d 1509, 1515 (10th Cir. 1990).

Luna-Santana further contends that even if the initial encounter was consensual, at some point the encounter became an illegal detention. In support of his argument, Luna-Santana cites, among other things, the facts that there were four troopers on the scene and that the troopers took the car apart during the course of the search, refused to permit Luna-Santana to go down the road to use the rest stop restroom, and that "he felt that the Troopers were in complete charge of the situation and thus it [would do] no good to object." "Whether an encounter is a detention or a consensual encounter depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline

-12-

the officer's requests or otherwise terminate the encounter." *Hernandez*, 93 F.3d at 1498. Because this test is an objective one, Luna-Santana's reliance on his subjective belief to support his claim of an illegal detention is misplaced. *Id.* at 1499. While "coercive behavior conceivably could turn a consensual encounter into an improper detention," there is nothing in the record to suggest that the conduct of the officers was coercive or overbearing such that a reasonable person would not have felt free to leave or otherwise terminate the encounter. *United States v. Rosborough*, 366 F.3d 1145, 1149 (10th Cir. 2004). The record shows that during the search Luna-Santana was standing outside conversing with his fellow passengers and Trooper Bisceglia. To the extent Luna-Santana was seated in the patrol car during the course of the search, the record indicates the officers offered Luna-Santana a seat in the car as a respite from the heat. That the officers directed Luna-Santana to urinate on the side of the road instead of stopping the search to drive him to the rest stop does not indicate that the encounter was no longer consensual. Thus, the district court did not clearly err in concluding that the entire encounter was consensual.

More importantly, during the course of the consensual search, the troopers located a glass pipe, an altered map case, and a suspicious red button which provided probable cause to search the vehicle and thereafter rendered consent by Luna-Santana irrelevant. *See United States v. Ross*, 456 U.S. 798, 809 (1982);

*Rosborough*, 366 F.3d at 1152-53; *West*, 219 F.3d at 1178-79. We reject Luna-Santana's suggestion that the officers lacked probable cause. The district court's conclusion that the troopers had probable cause to search the vehicle is a legal conclusion reviewed *de novo*. *Rosborough*, 366 F.3d at 1152. "Probable cause to search a vehicle is established if, under the totality of the circumstances there is a fair probability that the car contains contraband or evidence." *United States v. Nielsen*, 9 F.3d 1487, 1489-90 (10th Cir. 1993) (quotation omitted). The officers found a glass pipe identified as illegal drug paraphernalia that was sufficient to establish probable cause at least to continue the search of the vehicle's passenger area. *See, e.g.*, *United States v. Wald*, 216 F.3d 1222, 1226 (10th Cir. 2000) (smell of burnt marijuana provides probable cause to search the passenger compartment of the vehicle). The officers then located a potentially altered map case that would not open and a suspicious red button that appeared to have no function, indicating the possibility of drug trafficking. Thus, the district court properly concluded that the officers had probable cause to search the entire vehicle and arrest the occupants of the vehicle.[4]

---

[4]The fact that Quintero later admitted ownership of the pipe did not require the officers to release Luna-Santana. The officers had found an altered map case, a suspicious red button, and a methamphetamine pipe in Luna-Santana's vehicle which gave the officers probable cause to believe that contraband was hidden in the vehicle. *See United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216-17 (10th Cir. 1998).

For the foregoing reasons, we affirm the district court's denial of Luna-Santana's motion to suppress the evidence seized from his vehicle.

**B. Mistrial**

Luna-Santana also argues that the district court erred in denying his motion for a mistrial based on a statement made by the prosecutor in his closing argument that, Luna-Santana asserts, improperly commented on his Fifth Amendment right to remain silent. The comment at issue occurred during the government's rebuttal argument. In relevant part the exchange was as follows:

> MR. MURRAY [Assistant United States Attorney]: "Tricky Tahoe" versus "as is:" As I said at the beginning, this is the "tricky Tahoe case." In fact, the defendant used it to his advantage in trial. It's so tricky with all these hidden compartments, that he can come in to trial–he doesn't but his lawyer suggests that it's so tricky that not even he–
> MR. PRETTY [Defense Counsel]: Objection, Your Honor. May we approach the bench?
> THE COURT: Very well.
> (SIDE-BAR CONFERENCE)
> THE COURT: Yes, counsel?
> MR. PRETTY: Your, Honor, at this time I would move for a mistrial. Mr. Murray has violated a fundamental constitutional right on my client to remain silent. He specifically says "the defendant didn't but his lawyer did." So that is an impermissible comment on my client's silence, and I move for mistrial at this time.
> THE COURT: Mr. Murray?
> MR. MURRAY: Your Honor, it was not a comment on his right to remain silent. I said "the defendant can come in here and say," and I caught myself and I said, "The defendant's lawyer comes in and says." It was not a comment at all on his right to remain silent.
> THE COURT: Be cautious the government doesn't commit briefcase error here. With that cautionary note the objection is overruled, but obviously I don't want any comment, directly or indirectly, that

-15-

would penalize a defendant for standing on a constitutional right to remain silent in these proceedings. So with that understanding please continue.

MR. PRETTY: Judge, will you please reinstruct the jury about my client's absolute constitutional right to remain silent?

THE COURT: I intend to do that. Motion for mistrial denied.

(OPEN COURT)

THE COURT: All right, counsel.

MR. MURRAY: The tricky Tahoe is so tricky that Mr. Pretty can come in here and try to suggest that his client didn't know anything about the drugs because of the hidden compartments. "Tricky Tahoe case," tricky right through trial.

Prior to closing arguments, the district court told the jury that:

the defendant has chosen not to testify. That is his constitutional right. He enjoys, like all of us, the presumption of innocence. He never, like any of us, is ever burdened with the obligation of defending ourselves in a court of law. It's always the burden of the United States Government to prove guilt beyond a reasonable doubt. No citizen, no defendant, ever has to offer a defense. There's no affirmative duty to prove innocence. It's always the government's duty to prove guilt.

In its charge to the jury after closing arguments, the district court gave the following instruction:

A defendant in a criminal case has an absolute right under our Constitution not to testify. The fact that this defendant did not testify must not be discussed or considered in any way when you deliberate and arrive at your verdict. No inference of any kind may be drawn from the fact that a defendant decided to exercise his privilege under the Constitution of the United States and did not testify.

"[T]he test to determine whether a prosecutor's remark will be considered a comment on the defendant's failure to testify is whether the

-16-

language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Montgomery*, 802 F.2d 1225, 1226 (10th Cir. 1986) (quotation omitted). The district court's denial of a motion for a mistrial based on such prosecutorial misconduct is reviewed for abuse of discretion. *United States v. Gabaldon*, 91 F.3d 91, 93-94 (10th Cir. 1996). The question is whether the prosecutor's comment regarding Luna-Santana's Fifth Amendment right to remain silent was so prejudicial as to deprive Luna-Santana of his Sixth Amendment right to a fair trial. *United States v. Coleman*, 7 F.3d 1500, 1506 (10th Cir. 1993).

After reviewing the record, we conclude that the comment by the prosecutor, assuming it was an improper reference to Luna-Santana's decision not to testify at trial, did not entitle Luna-Santana to a mistrial. The reference to Luna-Santana's decision not to testify was neither obvious nor extensive. Nor did the prosecutor's statement, in the context of the entire trial, deprive Luna-Santana of the right to a fair trial. Moreover, the district court clearly instructed the jury of the defendant's right to remain silent and the jurors are presumed to have followed that instruction. *Id.* Thus, the district court did not abuse its discretion in denying Luna-Santana's motion for a mistrial.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of both Luna-Santana's motion to suppress and his motion for a mistrial.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge