[No. H026546. Sixth Dist. June 16, 2005.]

**[As modified Aug. 12, 2005.]**

THE PEOPLE, Plaintiff and Respondent, v.
WEIBIN JIANG, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of section C.

## COUNSEL

Gerald F. Uelmen for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan M. Helfman and Jeffrey M. Laurence, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MIHARA, J.**—Defendant was arrested and charged with committing sexual offenses against an acquaintance. After his arrest, he was interviewed by a detective with the assistance of a Mandarin interpreter. The interpreter did not adequately convey to defendant in Mandarin the detective's admonitions about defendant's constitutional rights. The trial court denied defendant's motion to suppress his statement to the police on *Miranda*[1] grounds. Defendant was released on bail shortly after his arrest, and he used his employer-issued laptop computer to prepare numerous documents for his attorneys regarding the charged offenses. He placed these documents in a folder on the computer called "Attorney" and password-protected each of them. The prosecutor subsequently used a subpoena duces tecum to obtain the documents on this laptop computer from defendant's employer. The trial court found that these documents were not subject to the attorney-client privilege because defendant had no reasonable expectation of privacy in documents on an employer-issued laptop computer. The court denied defendant's motion to suppress the documents and recuse the prosecutor and ruled that the documents could be utilized by the prosecutor at trial. Defendant was convicted by jury trial and committed to state prison for a term of 19 years and 4 months.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

On appeal, defendant contends, among other things, that the trial court prejudicially erred in denying his suppression motion and in finding that the information in the documents on the laptop computer was not protected by the attorney-client privilege. We conclude that the trial court's error in denying the motion to suppress defendant's statement to the police merits reversal and address the attorney-client privilege issue and some of defendant's other contentions to provide guidance to the trial court in the event of retrial.

## I. Background

Because the issues we resolve in this appeal were all decided in limine, A.'s testimony at the July/August 2002 preliminary hearing provides the appropriate background for our analysis.

A. first met defendant in 1998 in China. She met him again in California in November 2001 when a mutual friend introduced them. She knew that defendant was married and had a young child, and defendant knew that A. had a boyfriend. Defendant gave A. his email address. In early December 2001, A. included defendant in an email she sent to a group of friends. She and defendant emailed back and forth over the next few weeks, and defendant offered to take her to lunch as a thank you for her email advice on purchasing a new car.

On December 22, they met at a café for lunch. They had a lengthy lunch and "talked a lot." A. offered to lend defendant some books to divert him from his loneliness while his wife and child were in China. She brought defendant back to her apartment to pick up the books. Upon arriving at her apartment, she found urgent faxes had arrived that she needed to translate for her boss. A. invited defendant to rest, read or watch a movie while she worked. He chose to rest on her couch. While she was doing her work, defendant approached and started touching her. She gave him a beer and some food and then some sake, and she sat on the couch talking to him. Later she put on a movie. Defendant started touching her again and tried to kiss her. She told him to stop. He poured more sake into his glass and made her drink it. Defendant kissed her, touched her breasts and removed her clothing. She again told him to stop.

Defendant dragged her to her bed and tried to rape her. He held her down, and she unsuccessfully tried to push him away. He put his hand on the outside of her vagina, and he touched his penis to her vagina. Defendant got tired, and A. went to the bathroom and took a bath. After her bath, she offered to drive defendant back to his car, and she did so. She also lent him the books she had recommended earlier.

The next afternoon, defendant came to her door with a bunch of flowers. She opened the door and asked him what he was doing. He said he wanted to apologize for the previous day, and she admitted him to her apartment. A. admonished him for his behavior on December 22, and he apologized. They talked for 30 or 40 minutes. Eventually she asked him to leave because she was busy. He asked to use her telephone, and then he asked for some water. When she went to get him a bottle of water, he grabbed her from behind and dragged her toward the bed. After stopping briefly on the couch, he pushed her to the bed, held her down and removed her clothes. Defendant also removed his own clothing.

He tried to kiss her and touched her breasts. Defendant put his fingers in her vagina at least a couple of times. He also put his penis in her vagina. A. was unable to struggle because he was pushing her, but she cried very hard. Defendant ejaculated outside her vagina. Defendant told her that she "could not sue me for rape because you do not have any evidence." After some time, A. was able to free herself and go to the bathroom. She took a shower for half an hour and cried. Defendant told her not to cry so loud. She repeatedly asked him to leave, and eventually he did.

The next day, A. called the mutual friend who had introduced her to defendant and told him that defendant had "done something very, very bad to me." She asked him to tell defendant to leave her alone. Defendant continued to email her, telephone her, knock on her door and leave flowers and once a note on her doorstep, but she had no further personal contact with him. Her attempts to block his emails were unsuccessful. She changed her telephone number and moved to a different residence.

On January 9, 2001, A. went to the police department and reported "sexual harassment" by defendant. A. had told no one about the sexual assaults before she went to the police department, but she had asked friends for advice about "sexual harassment." She did not initially report the sexual assaults to the police, but she subsequently reported the December 23 assaults and later the December 22 assaults. A. was reluctant to report the sexual assaults because, after more than two weeks, she believed that the police would be unable to find any evidence. She finally reported the sexual assaults because she was so afraid of defendant.

Defendant was charged by information with forcible rape (Pen. Code, § 261, subd. (a)(2)), two counts of forcible sexual penetration (Pen. Code, § 289, subd. (a)(1)), two counts of sexual battery (Pen. Code, §§ 242, 243.4, subd. (a)), assault with intent to commit rape (Pen. Code, § 220) and making annoying telephone calls and electronic communications (Pen.

Code, § 653m, subd. (b)). It was specially alleged that the rape and sexual penetration offenses had occurred in the course of a burglary (Pen. Code, § 667.61, subds. (a), (d)).

The jury deliberated for a day and a half before returning its verdicts. Defendant was convicted of all of the charged counts, but the special allegations were found not true. The court committed defendant to state prison for a term of 19 years and four months. Defendant filed a timely notice of appeal.

## II. Discussion

### A. Statement to Police

Defendant contends that the trial court prejudicially erred in refusing to suppress his statement to the police. He asserts that his waiver of his constitutional rights was not knowing and voluntary because the advisements were inadequate.

### 1. Background

Defendant is a native of China who came to the United States in April 2001. Schools in China require students to take six years of English courses in high school and two years in college. While attending one of the best colleges in China between 1990 and 1995, defendant took a single course in "Technological English" and took a course in Metallurgy that was taught in English.

Between 1998 and 2000, defendant worked as a project manager in China. His job required him to visit several other Asian countries to negotiate and execute contracts for the export of electronic equipment. During one three-day negotiation in China in 1998, defendant sometimes spoke English to involved individuals who did not speak Mandarin.

Defendant came to the United States to work for Cadence Design Systems. His Cadence employment application was completed in English, and defendant supplied an English version of his resume. Defendant often used English to send brief work-oriented emails and other brief emails to friends.[2] The Cadence-issued laptop computer that defendant used was "defaulted in English" and had English set as the first language preference for email. Defendant used the laptop to prepare documents in English.

---

[2] The prosecution introduced a number of exhibits at the in limine hearing on defendant's suppression motion to establish defendant's proficiency in English.

Defendant usually communicated orally in Mandarin at work because he did not speak English well. This was not a problem because defendant's coworkers were all from China and usually spoke in Mandarin. His brother, who also worked at Cadence, served as a translator for defendant when one was required. Defendant could write in English "pretty good," much better than he could speak it.

The charged offenses occurred in December 2001, eight months after defendant's arrival in the United States. Defendant's email communications with A. were primarily in English, but their oral communications were always in Mandarin. Detective Joel Witmer arrested defendant on January 15, 2002. At the time of the arrest, Witmer had a "very brief" conversation with defendant in English. During the booking process, another officer asked defendant questions in English in order to fill out a "Medical Information Questionnaire." Defendant responded in English to these questions. With the single exception of "sexual preference," these were simple yes or no questions. The officer testified that defendant did not understand "every word but he was able to answer the medical questions."

After defendant had been booked, Witmer took him into an interview room. While he was bringing defendant to the room, Witmer had a brief conversation with defendant in English. Defendant had "some communication difficulties." Although Witmer believed that defendant "understood basic English," Witmer "realized that there was a language barrier to some degree that would require an interpreter" because "I was going to need to get a precise conversation."[3] "The concept was getting in the specific rights or the Miranda admonition. It was what I considered a complex conversation."

Witmer contacted the "AT&T Interpreter Service" by telephone. A tape recording was made of the conversation between Witmer, the interpreter and defendant beginning at this point.[4] Witmer initially asked the Mandarin interpreter to "let me know if there's any problem as far as the translation between you two." Witmer believed that the interpreter was accurately translating what he was saying and that defendant was understanding him. Defendant was in the interview room with Witmer and could hear Witmer. The interpreter, who said her name was Tran, was on the telephone with both Witmer and defendant. Witmer told the interpreter that "before we speak to

---

[3] Although defendant did not request an interpreter during the interview, he did ask to speak to his brother or boss before being questioned. Witmer refused this request.

[4] The parties stipulated to the accuracy of a transcript of this recording that was prepared by a registered court interpreter. The tape recording itself was introduced at the hearing on defendant's suppression motion, and the trial court listened to the tape recording. We too have listened to the tape recording.

him, or before I speak to him, I need to read him his Miranda rights." The three-way dialogue follows with the portions in Mandarin italicized.

"INTERPRETER: Um, his, uh, what?

"WITMER: I need to read him his rights. I need to read him his rights.

"INTERPRETER: His right. Okay. *Before he speaks with you, he wants to tell you about your rights.*

"JIANG: *But, uh, now I-I-I just, I, I just feel, just they, I came from Beijing, from, like, directly to the United States to work, and then with that [A.] I had a bit of a disagreement with her. Bec-, after she, like, I sent an e-mail saying, that, sorry, that like I saw that she was using it as evidence or something to sue me. To sue me, and then they, now I'm not . . .* [5]

"INTERPRETER: *Okay, wait a minute, okay?*

"WITMER: Tran? Tran? Tran?

"INTERPRETER: Yes?

"WITMER: I'm not sure what he's really talking about.

"INTERPRETER: Right.

"WITMER: I want to read him his rights first?

"INTERPRETER: *Okay, you first listen a while. He will first have, have your rights . . .*

"JIANG: Sorry.

"INTERPRETER: *. . . told to you, okay?*

"JIANG: Mm.

"INTERPRETER: Okay, all right, sir.

"WITMER: After each one, can you ask him if he understands?

---

[5] On January 5, 2002, A. had sent defendant an email in which she threatened "to sue you for stalking and sexual harassment" if he continued to contact her.

"INTERPRETER: Okay.

"WITMER: Please. I want to make sure he understands each one of them.

"INTERPRETER: All right.

"WITMER: Explain to him that he has the right to remain silent.

"INTERPRETER: *You have the right, um to remain silent.*

"JIANG: Mm-mm.

"INTERPRETER: Okay.

"WITMER: Does he understand?

"INTERPRETER: *You . . .*

"JIANG: Yes . . .

"INTERPRETER: *. . . understand?*

"JIANG: I understand.

"INTERPRETER: Okay.

"WITMER: Anything you say may be used against you in court.

"INTERPRETER: *Anything you say . . .*

"JIANG: Yes.

"INTERPRETER: *Uh, you understand, right?*

"JIANG: *I understand.*

"WITMER: Do you understand?

"JIANG: Yeah.

"WITMER: You have the right to the presence of an attorney before and during any questioning.

"INTERPRETER: *You have the right, uh, to use an attorney, uh, before and after, proceedings all can use an attorney.*

"JIANG: *Right, I haven't seen my attorney.*

"WITMER: Do you, do you understand that?

"INTERPRETER: *Uh . . . do you understand?*

"JIANG: Yes.

"WITMER: I have one more question for him: . . .

"INTERPRETER: Uh-huh.

"WITMER: If you cannot afford to hire an attorney . . .

"INTERPRETER: Uh-huh.

"WITMER: . . . one will be appointed for you free of charge before any questioning.

"INTERPRETER: *Okay, if you cannot, uh, if you cannot afford, uh, afford an attorney, he can appoint one for you, and then before you are questioned, you . . . he can pay . . . can provide you with an attorney.*

"JIANG: Mm.

"WITMER: Do you understand that?

"INTERPRETER: *You . . .*

"JIANG: Yes, I understand.

"WITMER: Do you have any questions?

"INTERPRETER: *Do you have any questions?*"

At this point, defendant asked if he could "first see my elder brother" or "my boss." Witmer informed defendant that he could telephone his boss or brother "after" the interview. The following dialogue then occurred.

"WITMER: Okay, I have some questions I want to ask him.

"INTERPRETER: *He's going to ask you some questions.*

"JIANG: Mm. Okay.

"WITMER: Okay? What is your relationship with [A.]?

"INTERPRETER: *What is your relationship with [A.]?*"

Defendant responded to this and other questions. Some of his responses were in English, some were in Mandarin, and some were a mixture. Although defendant was able to give brief responses in English at times, his halting attempts to speak English displayed no fluency. At one point, after Witmer had asked a question in English but the interpreter had not yet translated it, defendant asked the interpreter in Mandarin "[w]hat did he say?"

During the interview, defendant initially denied that he had had "an affair" with anyone. He admitted that he had been to A.'s apartment two or three times. Defendant then admitted that he had "kissed" A. but "I did not formally have sex with her." He said he was "embarrassed" about the incident because he was married and had been drunk at the time. Defendant also admitted returning to A.'s apartment the day after their first sexual encounter. On this second occasion, he "held her . . . got in bed, and then kissed her." Defendant said "she did not refuse me." Defendant admitted that he had touched A.'s breasts, but he adamantly denied that they had actually completed an act of sexual intercourse. He claimed that they did not complete the act because A. was afraid of getting pregnant, and he prematurely ejaculated. Defendant said that after the attempted intercourse he placed his finger in A.'s vagina to give her "an orgasm."

Defendant said he engaged in these acts with A. because he "felt very sorry for her" and had "sexual relations with her" to "make her happy." Defendant said it was "hard to say" whether A. "ask[ed] for it," but "she did not refuse." When Witmer accused defendant of "forc[ing]" A. to have sex, defendant said (in Mandarin): "I didn't force her. But, I mean, she also, I mean, I couldn't say that it was playacting, but, it's, saying that she pushed me away, she also-also-also was grabbing me." He claimed that A. grabbed his shoulder and "played with" a piece of jade "on my chest." The tape recording of the interview appears to end prior to the completion of the interview.

On a subsequent day, Witmer had a brief conversation in English with defendant, and defendant appeared to understand him. The remainder of that conversation was translated for defendant by defendant's boss.

Defendant's motion to suppress his statement to Witmer on *Miranda* grounds was granted by the magistrate at the July 2002 preliminary hearing.

In April 2003, defendant moved to suppress the statement on the same grounds at trial. The trial court held an Evidence Code section 402 in limine hearing at which evidence was presented by the prosecutor and the defense regarding the admissibility of the statement.[6]

A Mandarin interpreter testified at the hearing that Chinese people tend to use the word "yes" to mean "continue" rather than meaning "I agree." Yun Xiang Yan, an anthropology professor at the University of California, Los Angeles, testified at the hearing as an expert on Chinese culture. Yan had studied the relationship between individuals and the government in China. Because most Chinese citizens "are afraid of [the] police force," it is "out of the question" for them to refuse to respond to police questions. Such a refusal subjects a person to punishment in China. Chinese citizens who come to the United States are even more fearful of the police here.

The prosecutor conceded that defendant had a "poor" or "limited" understanding of English. She also conceded that the interpreter utilized by Witmer "didn't get it perfect," but she argued that the translations of three of the four advisements were "sufficient" and the translation of the fourth advisement was only inadequate because defendant interrupted the interpreter to tell Witmer, in English, that he understood. She argued that defendant had "enough understanding of basic English to have understood" the portion of that advisement that was not translated by the interpreter. The prosecutor asserted that, although the interpreter "uses some unfortunate word choices," the right to an attorney had been adequately conveyed to defendant.

The trial court found that the interpreter's failure to use "magic words" did not invalidate the advisements. The court noted that there were points in the interview when "defendant either interrupts or answers the questions directly without the aid of interpretation." The court also noted that "when he is first advised by the interpreter of Detective Witmer's need to read him his rights, the defendant launches into an explanation." "So when you take all of these things into consideration, the fact that he has work experience at the Department of Export. He's engaged in the export of electronic equipment and projects for military use and has visited Bangladesh, Pakistan, Thailand, Singapore, Indonesia, India. Is a project manager, to execute contracts and those contracts were conducted in English, which is the testimony I've been provided. [¶] English was spoken with at least the Pakistanian contract that you heard testimony about. Taking into consideration his highly educated background, when you put all of those things together and viewing them in the totality of the circumstances, . . . the court is going to find that the People

---

[6] A., who, like defendant, had been born and raised in China but who, unlike defendant, had been in the United States for several years, testified that she had been unable to understand portions of the preliminary hearing due to the absence of an interpreter.

have met their burden and the court finds that the defendant made a knowing intelligent, free and voluntary waiver of his Miranda rights."

## 2. Analysis

■ "An appellate court applies the independent or de novo standard of review, which by its nature is nondeferential, to a trial court's granting or denial of a motion to suppress a statement under *Miranda* insofar as the trial court's underlying decision entails a measurement of the facts against the law. [Citations.] As for each of the subordinate determinations, it employs the test appropriate thereto. That is to say, it examines independently the resolution of a pure question of law; it scrutinizes for substantial evidence the resolution of a pure question of fact; it examines independently the resolution of a mixed question of law and fact that is predominantly legal; and it scrutinizes for substantial evidence the resolution of a mixed question of law and fact that is predominantly factual." (*People v. Waidla* (2000) 22 Cal.4th 690, 730 [94 Cal.Rptr.2d 396, 996 P.2d 46].) "[W]e accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence. [Citation.] Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained, [citation] we ' "give great weight to the considered conclusions of a lower court that has previously reviewed the same evidence." ' " (*People v. Wash* (1993) 6 Cal.4th 215, 235–236 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)

■ "A translation of a suspect's *Miranda* rights need not be perfect if the defendant understands that he or she need not speak to the police, that any statement made may be used against him or her, that he or she has a right to an attorney, and that an attorney will be appointed if he or she cannot afford one." (*U.S. v. Hernandez* (10th Cir. 1996) 93 F.3d 1493, 1502.) "Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant. [Citations.] The age of the defendant is one factor in applying the totality test. [Citation.] Similarly, any language difficulties encountered by the defendant are considered to determine if there has been a valid waiver. [Citations.] There is a presumption against waiver, and the burden of showing a valid waiver is on the prosecutor." (*U.S. v. Bernard S.* (9th Cir. 1986) 795 F.2d 749, 751–752.)

■ "[A]fter the required warnings are given the accused, '[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' . . . [T]he question whether the accused waived his rights 'is not one of form, but rather

whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case.' Thus, the determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." (*Fare v. Michael C.* (1979) 442 U.S. 707, 724–725 [61 L.Ed.2d 197, 99 S.Ct. 2560], citations omitted.)

Initially, we must decide whether the interpreter's translation adequately informed defendant of his rights. The tape clearly demonstrates that defendant was informed in Mandarin of his right to remain silent and that he acknowledged his understanding of that right. At that point, the interpreter's translation diverged from Witmer's enunciation of defendant's rights. Although Witmer gave the remaining advisements accurately in English, the interpreter did not accurately or completely translate those advisements into Mandarin for defendant.

First, the interpreter did not translate most of Witmer's advisement that anything defendant said could be used against him in court. Instead, she merely translated the first three words of this advisement into Mandarin and then stopped when defendant said "Yes." She then asked him in Mandarin if he understood, and he said he did, but it is impossible to discern what it was that he was acknowledging that he understood. While "[a] suspect may not 'out Mirandize' the police by reciting his *Miranda* rights before the officer has admonished him and later claim the admonition was defective" (*People v. Nitschmann* (1995) 35 Cal.App.4th 677, 683 [41 Cal.Rptr.2d 325]), a suspect who merely interjects a "Yes" in the midst of a translation does not demonstrate any understanding of the as-yet-untranslated portion of the advisement. This is particularly true where a suspect with a poor understanding of English may have understood the English word "Yes" to mean "continue" rather than to signify an understanding of the English advisement.

Second, the interpreter badly mangled Witmer's advisement regarding defendant's right to counsel. She did not tell defendant that he had a right to have an attorney present during questioning. The interpreter's translation of Witmer's advisement inaccurately told defendant in Mandarin that he had a right to "use an attorney, uh, before and after, proceedings . . . ." This advisement wholly omitted any reference to a right to the presence of an attorney during questioning. An uninformed suspect, particularly one from a foreign country, might well perceive "proceedings" to refer only to formal hearings in court rather than to a police interview. And the reference to "before and after" rather than "during" increased rather than diminished the

potential for misunderstanding. As given in Mandarin, this advisement appeared to tell defendant that he had a right to "use" an attorney before and after court hearings rather than the right to have an attorney present during a police interview.

This is not like the admonition in *Wash.* In that case, the California Supreme Court held that an admonition that the suspect has a right to counsel "before" questioning is not "so ambiguous or confusing as to lead defendant to believe that counsel would be provided before questioning, and then summarily removed once questioning began." (*People v. Wash, supra,* 6 Cal.4th at p. 236.) Here, however, the reference to "before and after" was coupled with "proceedings" rather than "questioning," and the overall effect was a perceived restriction of the right to counsel to formal court proceedings.

Third, the interpreter's translation of the final advisement was also inaccurate. She told defendant that, if he was unable to afford an attorney, Witmer could "appoint one for you, and then before you are questioned, you . . . he can pay . . . can provide you with an attorney." This mutilated advisement told defendant that the police officer could select an attorney for him. The inaccurate Mandarin advisement also was ambiguous about who would pay the attorney: "you . . . he can pay." While this advisement actually mentioned "before you are questioned," this phrase was severed from any meaning because it was unclear whether this referred to the time of payment or the time of provision of the attorney.

As the Mandarin translations of three of the four advisements were hopelessly inadequate, we are forced to conclude that defendant was not validly informed of his rights *in Mandarin.* The next question is whether the prosecution proved that defendant was adequately informed of his rights through the accurate *English* advisements notwithstanding the inaccuracies in the Mandarin translations of those advisements.

There was considerable evidence that defendant was an educated man who had taken English courses in China and was capable of writing brief emails and documents in English. However, the only evidence of his ability to *speak* English and *understand spoken English* indicated that his skills were rudimentary. Indeed, the prosecutor *conceded* that defendant had only a "poor" or "limited" understanding of English. Her contention was that defendant's limited knowledge of English was sufficient for him to credit Witmer's English advisements over the inaccurate and incomplete Mandarin translations of those advisements given by the interpreter. We cannot agree.

 It defies logic to expect a suspect who has a poor understanding of English to credit his own limited understanding of advisements given in

English over the version translated into his native language by a person purporting to be a fluent interpreter. Certainly the prosecutor failed to meet her burden of proving this doubtful proposition. We must therefore conclude that defendant was not adequately and accurately advised of his constitutional rights. Consequently, any waiver was not knowing, and the trial court erred in admitting defendant's statement into evidence at trial.[7]

The Attorney General asserts in a single brief paragraph, which is devoid of citation to the record or any authority, that the admission of defendant's statement was harmless beyond a reasonable doubt. He claims that the statement was actually helpful to defendant's case at trial because it contained the only evidence supporting his consent defense. The statement was actually quite incriminating. Defendant admitted engaging in all of the charged sexual activities, and his statements regarding consent were very weak. Nor is it correct that the statement was the only evidence supportive of defendant's consent defense. The email exchanges between defendant and A. after the charged offenses could be construed as supporting his defense, and supportive inferences also could have been drawn from A.'s failure to initially report any illegal sexual activity even when she belatedly contacted the police.

A trial court error in failing to exclude a statement on *Miranda* grounds is subject to harmless error review under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*People v. Johnson* (1993) 6 Cal.4th 1, 33 [23 Cal.Rptr.2d 593, 859 P.2d 673].) "The beyond-a-reasonable-doubt standard of *Chapman* 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*People v. Neal* (2003) 31 Cal.4th 63, 86 [1 Cal.Rptr.3d 650, 72 P.3d 280].) The one-paragraph argument by the Attorney General is not sufficient to satisfy his burden of proving that the error was harmless beyond a reasonable doubt. It follows that the judgment must be reversed.

### B. Attorney-client Privilege

We reverse the judgment because the trial court erred in failing to suppress defendant's statement to the Witmer. We also need to address defendant's claim that the trial court erred in denying his recusal/suppression motion

---

[7] Since the advisements were not sufficient to inform defendant of his constitutional rights, we need not consider whether the prosecution established that defendant's responses to Witmer's questions constituted an implied waiver. "Although [an implied waiver] may not be inferred 'simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained' [citation], it may be inferred where 'the actions and words of the person interrogated' clearly imply it." (*People v. Cortes* (1999) 71 Cal.App.4th 62, 69 [83 Cal.Rptr.2d 519].)

based on the prosecutor's acquisition of defendant's attorney-client information because the issue of the recusal of the prosecutor and/or the suppression of this information may arise again if this matter is retried.

## 1. Background

In connection with his prospective employment by Cadence, defendant signed an "Employee Proprietary Information and Inventions Agreement" in August 2000. One provision of this four-page document, which was in English, was the following: "8. NON-PRIVATE NATURE OF COMPANY PROPERTY. I understand that I have no expectation of privacy in the voicemail and electronic mail provided to me by the Company or in any property situated on the Company's premises and/or owned by the Company, including disks and other storage media, filing cabinets or other work areas. I further understand that such property, including voicemail and electronic mail, is subject to inspection by Company personnel at any time."

Defendant was arrested on January 15, 2002. He was initially represented by Richard Pointer. Defendant was released on bail on January 25, 2002. In February 2002, defendant's first Cadence-issued laptop computer was seized from him pursuant to a search warrant. In March 2002, Terrence Daily replaced Pointer as defendant's attorney.

On May 16, 2002, the prosecutor issued a subpoena duces tecum to Cadence. This subpoena sought "All correspondence in English that [defendant] authored and wrote including, but not limited to e.mails [*sic*], memos, and other work related documents." The declared purpose of the subpoena was to obtain evidence of defendant's understanding of and ability to communicate in the English language. Cadence was directed to deliver these documents to the court under seal. After the issuance of this subpoena, Daily contacted the prosecutor to express his concern that the subpoena sought documents on defendant's second Cadence-issued laptop computer that were privileged.[8] The prosecutor assured Daily that she would notify Cadence not to include any documents "addressed to" an attorney.

Cadence provided a CD and printed documents to the court in June 2002. The CD contained documents and emails from defendant's second Cadence-issued laptop computer. The prosecutor represented to Daily and the court that the printed documents represented all of the contents of the CD. The court and Daily reviewed the printed documents. Defendant was not present when they did so. Daily found no privileged documents. The court then

---

[8] This laptop was a replacement for the one that had been seized in February 2002 pursuant to the search warrant.

released the documents and the CD to the prosecutor, who was to provide a copy to Daily. She gave Daily copies of the documents and CD on June 27, 2002. Her transmittal letter stated that she was providing "Subpoenaed records from Cadence Design Systems, Inc." and a "CD Rom of those same records." Daily never looked at the CD and had no idea that it contained any documents other than the electronic versions of the printed documents he had reviewed in court.[9] This was the only CD that the prosecutor ever provided to Daily.[10]

The preliminary hearing began on July 31, 2002. On August 1, 2002, defendant was bound over for trial. In September or October 2002, the prosecutor reviewed the CD and noticed that there were "fourteen block[ed] access documents" on it that had not been included in the printed documents. These documents were not segregated or otherwise specially designated on the CD. They were simply listed along with the other Microsoft Word documents. The prosecutor believed that Cadence had blocked access to these files. She did not inform Daily of her discovery.

In January 2003, Jaime Harmon replaced Daily as defendant's trial counsel. Harmon received a CD from Dailey when he transmitted his file to her. She believed that this CD contained emails found on defendant's first laptop computer. In February 2003, Harmon received a CD from the prosecutor that contained the emails from defendant's first laptop.

In March 2003, the prosecutor contacted Cadence's attorney and asked him to obtain the "access code" for the documents she had discovered on the CD but not among the printed documents. When the prosecutor's investigator examined the CD, the investigator reported that "[s]everal documents were password protected due to possible 'attorney/client' privilege and were not viewed." The prosecutor received the password from Cadence on April 10, 2003 but did not look at it immediately.

On April 14, the prosecutor first disclosed the existence of "blocked access" documents. She told the court and Harmon that her office had received the "access code" for 14 files to which defendant had blocked access, but she had not looked at the access code or opened the files. This disclosure occurred during a discussion of the proposed testimony of a defense expert. Harmon had asked the prosecutor how she had acquired the expert's report. In the course of the prosecutor's explanation, the prosecutor made the following statement. "Also in light of several of the e-mails that were provided pursuant to the S.D.T. [subpoena duces tecum] or the documents that I pointed out in my 402 hearing, that the defendant put a block on,

---

[9] Daily testified that he was "[a] dinosaur" and was not computer literate.

[10] She gave Daily a floppy disk containing the emails that had been found on the first laptop.

if you read those titles, it's pretty clear, at least it's strongly suggestive, that those are the documents that were provided to Dr. Yan to form his opinion. So everybody has got them but me, your honor." Harmon explained that Yan, the expert, had been given "a statement prepared by my client to Mr. Daily apparently and then turned over as a means of orienting Dr. Yan to the circumstances."

On April 16, during the hearing on the admissibility of defendant's statement to the police, the prosecutor had the CD marked as an exhibit and admitted into evidence. She then asked her investigator if she had found any files on the CD "that were blocked." The investigator said yes. The prosecutor asked the investigator if she was "able to open them up." The investigator said "[n]ot with conventional methods, no. So I did not." On cross-examination, the investigator testified that it was her understanding that the documents on the CD came from Cadence's server rather than from defendant's second Cadence-issued laptop. The prosecutor did not ask the court to look at the documents on the CD.

The prosecutor decided on her own that there was "no attorney-client privilege" to any documents on the CD because "it was a work computer and they were not e-mails." On April 23, the prosecutor informed Harmon off-the-record that she "did not believe that there was a privilege" and "would use the access code" to open the files and provide copies to Harmon. Harmon believed that the prosecutor was referring to emails she had already seen, and she said she might object to admissibility. The following colloquy occurred on the record. "MS. RAABE [the prosecutor]: . . . [¶] The first matter, Your Honor, that in the previous 402 hearing I made mention that there were several files that were provided on the Cadence CD that were blocked by an access code. I informed counsel and the Court in chambers that the access code was actually placed on the documents by the defendant. I have not accessed those documents until I let the Court know that I was going to be using the password provided by Cadence to access those documents. I will print them out and provide a copy to counsel if they are relevant. I will be seeking to use them in this jury trial. I actually don't know what they contain. I want to make it clear that I am proceeding. I do not believe that they are privileged in any way. They are basically documents that were left by the defendant in a public place. [¶] THE COURT: Certainly we can take that under submission until such time you have had an opportunity to research any objections counsel may have as to those documents." Harmon made no comment in response to this statement. She mistakenly believed that the prosecutor's reference to a CD referred to the CD of emails from defendant's first Cadence-issued laptop. The prosecutor believed that Harmon's lack of objection meant that she was not claiming that there was any privilege.

Later that day, the prosecutor used the password provided by Cadence to open the files and read portions of them. On April 28, copies of the documents were made available to Harmon, and Harmon received them on April 29. When Harmon received these documents, she immediately informed the prosecutor that these documents "were privileged communications" between defendant and his former attorneys.

On April 30, during in limine motions, the following colloquy occurred. "MS. RAABE: And then my last in limine, your honor, is the one that I provided today. And that involves the documents that I just recently provided to counsel which are the—[¶] MS. HARMON: Your honor, before there's any evidence about these documents on the record, I think we need to have a hearing about the fact that the district attorney has the documents in the first place, because it is our position that these document[s] are attorney-client privileged." The prosecutor claimed that the documents were not privileged and stated that she intended to "use those documents [for impeachment] at trial."

At Harmon's request, the court held a hearing on the claim of privilege.[11] The court considered testimony at the hearing, exhibits introduced at the hearing and the declarations submitted by the parties.

Defendant's wife testified that she, defendant's sister-in-law and defendant's boss and sometimes an interpreter acted as conduits between defendant and his attorneys Pointer and Daily because his attorneys could not understand defendant and needed these other people to translate for defendant.[12] Pointer asked defendant to prepare documents regarding the case, and defendant did so. Defendant wrote down in Mandarin or told his wife what he wanted to convey to his attorney, and his wife produced documents on defendant's second Cadence-issued laptop computer containing the informa-

---

[11] On May 5, 2003, Harmon filed a written motion seeking dismissal or a mistrial or recusal of the district attorney's office and suppression of the privileged documents. The prosecutor filed written opposition.

[12] The need for a translator continued when Harmon replaced Daily. Defendant's brother accompanied defendant to meetings with Harmon and translated for defendant. "It is no less the client's communication to the attorney when it is given by the client to an agent for transmission to the attorney, and it is immaterial whether the agent is the agent of the attorney, the client, or both." (*City & County of S. F. v. Superior Court* (1951) 37 Cal.2d 227, 236 [231 P.2d 26].) " 'This of course includes communications through an *interpreter*, and also communications *through a messenger* or any other *agent of transmission,* as well as communications *originating with the client's agent* and made to the attorney.' " (*Id.* at p. 237.) " 'While involvement of an *unnecessary* third person in attorney-client communications destroys confidentiality, involvement of third persons to whom disclosure is reasonably necessary to further the purpose of the legal consultation preserves confidentiality of communication.' " (*Oxy Resources California LLC v. Superior Court* (2004) 115 Cal.App.4th 874, 890 [9 Cal.Rptr.3d 621].)

tion defendant wished to convey to his attorney. Defendant's brother also assisted in the preparation of some of these documents.

The documents were printed out and given to defendant's attorneys.[13] These documents were created between February and June 2002 and amounted to 70 printed pages. Each document was password-protected with a password known only to defendant and his wife, and the documents were kept on the laptop in a folder called "Attorney." The reason for the password protection was to prevent "anyone else except our attorney" from seeing the documents. Pointer's investigator had told defendant and his wife to keep defendant's communications with Pointer "in a confidential manner and a clearly marked manner" so that they would remain "secret." The investigator suggested that defendant make a folder on his computer and "mark it attorney-client privilege." When Daily replaced Pointer as defendant's attorney, Pointer gave Daily the documents that defendant had prepared for Pointer, and Daily treated these documents as attorney-client privileged documents. Daily assured defendant that no privileged documents would be turned over to the prosecution by Cadence because "we had a double level, a filtering level, first Judge Garibaldi and then me."

Cadence's attorney testified that the prosecutor had contacted him about "a block on some of the documents that were on the CD." She mentioned that "she believed there was an issue or discussion with defense counsel that there may be privileged documents on the CD." He informed her that the password protection had been placed on the documents by defendant rather than by Cadence. When Cadence supplied the prosecutor with the password, Cadence's attorney believed that the documents would only be released by court order if they were found not to be privileged.

The prosecutor argued that the documents had never been privileged. She urged that the court "needs to look at what is society going to protect in terms of confidentiality, a reasonable person standard of whether or not there's a reasonable expectation of privacy in that laptop computer . . . . [¶] . . . Copies left in, basically, a public area . . . cannot be privileged." She also argued that defendant's failure to object on April 23 when she told the court and counsel that she was going to open the documents constituted a waiver of the privilege. Harmon argued that the prosecutor had violated Penal Code section 1326 and that defendant had a "reasonable expectation of privacy in things that were on his hard drive."

The court found that the documents were not privileged. "I'm making a ruling as to whether or not the defendant had a reasonable expectation of

---

[13] Daily testified that he had no email access.

privacy at the time he put them in the second laptop and whether or not he waived any privilege." "[T]he court concludes that the defendant did not have a reasonable expectation of privacy in said documents, any privileges that existed were waived by the defendant's own conduct." "[T]he manner in which he acted, he knew at the time that the laptop was subject to search warrant, that was on the first one. [¶] He nevertheless undertook, by his own conduct, he placed the documents in a second laptop that was issued by Cadence. He could not have a reasonable expectation of privacy with respect to the documents." The court deemed irrelevant "defendant's inability to understand the language or . . . criminal rules of procedure or anything of that nature" The court ruled that "said materials may be used as permitted by the Evidence Code for all purposes." The court refused to rule on whether the prosecutor had violated Penal Code section 1326.[14]

### 2. Analysis

The Attorney General maintains that the information in the documents on defendant's second Cadence-issued laptop computer was not privileged because the Cadence "Employee Proprietary Information and Inventions Agreement" signed by defendant eliminated any reasonable expectation of privacy in any documents on that laptop. He also argues that defendant "waived any privilege" by failing to object on April 23 when the prosecutor stated that she was going to open some documents.

A trial court ruling rejecting a claim of attorney-client privilege is ordinarily reviewed for substantial evidence where there are conflicting facts or inferences. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1208 [40 Cal.Rptr.2d 456, 892 P.2d 1199].) "[The] appellate court must view the evidence in the light most favorable to respondent and presume in support of the [ruling] the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) However, even when exercising substantial evidence review, the appellate court "must exercise its independent judgment in applying the particular legal standard to the facts as found." (*People v. Butler* (2003) 31 Cal.4th 1119, 1127 [6 Cal.Rptr.3d 730, 79 P.3d 1036].)

Here, almost all of the essential facts are undisputed, so we exercise our independent judgment in deciding whether the trial court correctly applied the applicable legal standard to the undisputed facts. Where there are factual disputes, we of course resolve them in favor of the trial court's ruling.

---

[14] Penal Code section 1326 governs the use of a subpoena duces tecum in criminal cases where the subpoena seeks records from a non-party business "relating to" a person other than the business. (Pen. Code, § 1326, subd. (c).) It requires compliance with Evidence Code section 1560, which mandates that the records be delivered to the court under seal and opened only at the court's direction. (Evid. Code, § 1560, subds. (b), (c), (d).)

■ "While it is perhaps somewhat of a hyperbole to refer to the attorney-client privilege as 'sacred,' it is clearly one which our judicial system has carefully safeguarded with only a few specific exceptions." (*Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 600 [208 Cal.Rptr. 886, 691 P.2d 642], fn. omitted.) The attorney-client privilege has been statutorily defined by the Legislature. " '[C]onfidential communication between client and lawyer' means information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship." (Evid. Code, § 952.) ■ We are bound by the statutory limits of this privilege because "the privileges contained in the Evidence Code are *exclusive* and the courts are not free to create new privileges as a matter of judicial policy." (*Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652, 656 [125 Cal.Rptr. 553, 542 P.2d 977]; see *Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 373 [20 Cal.Rptr.2d 330, 853 P.2d 496].)

"Whenever a privilege is claimed on the ground that the matter sought to be disclosed is a communication made in confidence in the course of the lawyer-client . . . relationship, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential." (Evid. Code, § 917, subd. (a).) "The effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (Evid. Code, § 606.)

### a. Existence of Privilege

The password-protected electronic documents on defendant's second Cadence-issued laptop computer indisputably contained information that defendant prepared at the direction of his attorney for his attorney and transmitted to his attorney.[15] By proffering evidence that these electronic documents were password-protected and placed in a folder called "Attorney" for the explicit purpose of protecting them from disclosure, defendant satisfied the initial evidentiary burden imposed on privilege claimants. (Cf. *People v. Mickey* (1991) 54 Cal.3d 612, 655 [286 Cal.Rptr. 801, 818 P.2d 84]

---

[15] These were not "independently prepared" documents that were simply turned over to his attorney. (*2,022 Ranch, L.L.C. v. Superior Court* (2003) 113 Cal.App.4th 1377, 1388 [7 Cal.Rptr.3d 197] ["[d]ocuments that are independently prepared by a party 'do not become privileged communications . . . merely because they are turned over to counsel.' "].)

[marital communication privilege].) The burden then shifted to the prosecutor to overcome the Evidence Code section 917, subdivision (a) presumption and prove that these documents were *not* confidential. The prosecutor attempted to do so by relying on the simple fact that defendant had signed the Cadence "Employee Proprietary Information and Inventions Agreement," which gave Cadence the right to inspect the laptop. She claimed that this agreement established that documents on the laptop were not confidential.

The Attorney General relies on *TBG Ins. Services Corp. v. Superior Court* (2002) 96 Cal.App.4th 443 [117 Cal.Rptr.2d 155] (*TBG*) to support this proposition. *TBG* was an action by an employee against his employer for wrongful termination after the employee was terminated for repeatedly accessing pornography on the Internet using his employer-issued office computer. The employee had signed the employer's computer use policy agreeing not to use any employer-issued computers for nonbusiness purposes without express approval. He had also agreed in this document that his computer use could be monitored by the employer, that any communications transmitted using the employer-issued computers were "not private" and that he could be fired for misusing the employer-issued computers. (*TBG*, at p. 446.) The policy also stated that the employer's monitoring would " 'include the review, copying or deletion of messages, or the disclosure of such messages or files to other authorized persons.' " (*TBG*, at p. 453.)

In defending against the employee's lawsuit, the employer sought production of a second employer-issued computer that the employee had been using at his home. (*TBG, supra,* 96 Cal.App.4th at pp. 446–447.) The employee objected and claimed that the production of the computer would violate his constitutional right to privacy. (*TBG*, at p. 447.) The trial court refused to compel production of the home computer, and the employer sought writ relief. (*TBG*, at pp. 447–448.) The Second District concluded that the employee's agreement that the computer's contents were not private defeated his claim that he had a protected privacy interest in the contents of the computer. (*TBG*, at p. 452.) Nevertheless, the Second District permitted the employee on remand to seek a protective order shielding his personal information on the computer from disclosure to *TBG*.

*TBG* had nothing to do with any *privileged* information, and there was no evidence that the employee had made any efforts to protect the personal information or segregate it from other files. The policy document signed by the employee in *TBG* was directly aimed at *precluding personal use* of an employer-issued computer and reserving the employer's right to *review, copy and disclose* any files found on the computer. Our case involves a statutorily-defined privilege. The agreement signed by defendant did not preclude personal use of the computer or mention anything about Cadence copying or

disclosing the contents of the computer. Defendant made substantial efforts to protect the documents from disclosure by password-protecting them and segregating them in a clearly marked and designated folder. *TBG* did not find that the employee lacked all privacy interest in the personal information on the computer. The Second District's disposition permitted the employee to avoid disclosure of his personal information by seeking a protective order. (*TBG, supra*, 96 Cal.App.4th at pp. 454–455.) *TBG* is simply inapposite.

*People v. Von Villas* (1992) 11 Cal.App.4th 175 [15 Cal.Rptr.2d 112] is also readily distinguishable. In *Von Villas*, the Second District held that the defendant's loud conversation with his wife in the jail visiting room with a guard obviously nearby was not protected by the marital communication privilege. (*Von Villas*, at pp. 220–221.) Defendant did not attempt to communicate privileged information in jail or by yelling in the presence of others. He placed attorney-client information on a laptop computer issued to him, password-protected that information and segregated it in a folder that clearly identified it as confidential. *Von Villas* tells us nothing of any relevance to our inquiry here.

Even if we assume that the trial court properly used an objective standard to evaluate the confidentiality of defendant's attorney-client information, we are convinced that defendant's belief in the confidentiality of his attorney-client information was an objectively reasonable one.[16] Nothing in the agreement defendant signed would have suggested to a reasonable person that

---

[16] The parties assume that the confidential nature of the documents depended not only on defendant's subjective belief that he had maintained them in a secure manner but also on the objective reasonableness of his belief that the documents were secure on the laptop. We believe that the statutory scheme does not support the application of an objective standard to determining whether an attorney-client communication was in confidence.

First, Evidence Code section 952 defines the attorney-client privilege in terms that explicitly depend on the client's subjective awareness. An attorney-client communication is "in confidence" if the "means" by which the "information" was "transmitted" do not "*so far as the client is aware*" disclose the information to unnecessary third parties. The marital privilege, which has been held subject to an objective "reasonable expectation of privacy" standard (*People v. Mickey, supra*, 54 Cal.3d 612, 654–655), is not statutorily defined in terms of the communicant's subjective awareness. The marital communication privilege protects a communication that was "made in confidence." (Evid. Code, § 980.) By defining the confidential nature of an attorney-client communication in terms of the client's subjective awareness, the Legislature explicitly rejected an objective test.

Second, the Legislature's recent enactment of Evidence Code section 917, subdivision (b), while not directly applicable here, suggests that the Legislature did not intend to preclude the attorney-client privilege from extending to stored electronic versions of what otherwise would be confidential communications simply because certain third parties may technically have access to these stored versions. Evidence Code section 917, subdivision (b) provides that a privileged communication "does not lose its privileged character for the sole reason that it is communicated by electronic means or because persons involved in the delivery, facilitation, or storage of electronic communication may have access to the content of the communication." (Evid. Code, § 917, subd. (b).)

Cadence would make any effort to gain access to information in documents on an employee's Cadence-issued computer that were clearly segregated as personal and password-protected. The agreement was designed to protect Cadence's intellectual property, not to invade the privacy of its employees. And nothing in the Cadence agreement barred employees from using their employer-issued computers for personal matters. Under the circumstances of this case, it was objectively reasonable for defendant to expect that attorney-client information in the password-protected documents he placed in a segregated folder marked "Attorney" on his Cadence-issued laptop would remain confidential.[17]

### b. Waiver of Privilege

The Attorney General contends that, even if the documents were originally privileged, this privilege was waived by Harmon and defendant when they failed to object on April 23 after the prosecutor said that she was going to open the documents.

It is true that Evidence Code section 917, subdivision (b) applies only to communications "by electronic means" and therefore does not strictly apply to these communications between defendant and his attorney since these communications culminated in a non-electronic transmission. But it hardly makes sense to ascribe to the Legislature the intent to provide more protection for information in an electronic document that is transmitted electronically than for information in an electronic document that is printed out and physically transmitted. In the modern world, the use of computers to prepare documents for either physical or electronic transmittal is nearly universal. Today's technology practically precludes the complete destruction of an electronic copy of a document. Even when a electronic document has been "deleted," all or a remnant of the document frequently remains on a computer. The Legislature's decision to mandate protection for electronic communications that necessarily may be accessible by disinterested third parties suggests that this type of access is not viewed by the Legislature as destroying the confidential nature of a communication. A subjective standard based on the client's awareness comports with the Legislature's recognition in Evidence Code section 917, subdivision (b) that the existence of a technical means of access to an electronic document does not destroy its privileged nature.

We have found no case holding that the confidentiality of an attorney-client communication depends on the *objective* reasonableness of the client's belief that the communication would remain confidential. The cases generally discuss the issue in terms of the client's "intent" that the communication remain confidential. (See *City & County of S. F. v. Superior Court, supra*, 37 Cal.2d at p. 235 [privilege extends to attorney-client communication if "the client intended the communication to be confidential"].) Because we believe that the statutory framework reflects that the Legislature intends this privilege to extend to communications that the client believes will remain confidential, we believe that the trial court applied the wrong standard. However, since we conclude that the trial court erred even under an objective standard, we need not reach the issue of the correct standard.

[17] The fact that defendant's first Cadence-issued laptop had been seized pursuant to a search warrant did not render his belief unreasonable. The first laptop contained defendant's email correspondence with A. The second laptop was issued well after defendant's arrest, and defendant could have reasonably believed that the prosecution would be unable to establish a basis for seizing the second laptop.

██ *Harmon* did not waive *defendant's* attorney-client privilege. The attorney-client privilege "is waived with respect to a communication protected by the privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including *failure to claim the privilege in any proceeding in which the holder has the legal standing and opportunity to claim the privilege.*" (Evid. Code, § 912, subd. (a), italics added.) "Subject to Section 912 and except as otherwise provided in this article, *the client*, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer if the privilege is claimed by: [¶] (a) The holder of the privilege." (Evid. Code, § 954, italics added.) ██ "Section 912, subdivision (a), *supra*, contemplates a waiver only when the holder of the privilege . . . reveals a significant part of the communication, consents to disclosure, or fails to object when he has the opportunity. The disclosure of the communication by [the attorney], unless done with the consent of the [client], will not, therefore, constitute a waiver of the privilege under section 912." (*Roberts v. Superior Court* (1973) 9 Cal.3d 330, 341 [107 Cal.Rptr. 309, 508 P.2d 309], citation omitted [psychotherapist-patient privilege].) The prosecutor produced no evidence that defendant had consented to Harmon waiving the privilege or authorized Harmon to waive his privilege.

The prosecutor also did not prove that defendant failed to claim the privilege when he had an opportunity to do so. Defendant, through Daily, made a timely assertion of privilege to the documents on his second Cadence-issued laptop computer shortly after the subpoena issued in May 2002. The prosecutor assured Daily that no attorney-client documents would be included, and Daily repeated this assurance to defendant. The prosecutor subsequently represented that the printed documents constituted the entire content of the CD. Daily carefully reviewed the printed documents in June 2002 and found no privileged documents. He and defendant were thereby lulled into believing that the attorney-client privileged documents on defendant's laptop had not been produced by Cadence and were not on the CD. Daily was computer-illiterate and never looked at the CD itself.

These facts distinguish this case from *People v. Gillard* (1997) 57 Cal.App.4th 136 [66 Cal.Rptr.2d 790]. In *Gillard*, the seized documents were "held under seal to allow Gillard to file a motion to suppress or to seek return of the materials . . . ." (*Gillard*, at p. 164.) When "[n]o motion or objection was filed[,] . . . the file was released to the prosecution." (*Ibid.*) Here, Daily preserved defendant's privilege by interposing a timely privilege objection while the documents were under seal and carefully reviewing the printed

documents, and he failed to protect the information only because the prosecutor provided him with misleading information.

When the prosecutor discovered in September or October 2002 that the CD contained additional documents, she did not notify defendant or Daily (or Harmon) that her earlier representations had turned out to be wrong. Nor did she apprise defendant or Harmon when she contacted Cadence in March 2003 and asked that the password protection be broken even though her own investigator believed that the documents had been "password protected due to possible 'attorney/client' privilege." At the April 16 hearing on the admissibility of defendant's statement to Witmer, the prosecutor's investigator testified that it was her understanding that the documents on the CD came from Cadence's server rather than from defendant's Cadence-issued laptop. This testimony was consistent with defendant's previous understanding that Cadence had not produced the privileged documents on defendant's laptop in response to the subpoena.

On April 23, the prosecutor told Harmon that there were "several files that were provided on the Cadence CD that were blocked by an access code" that "was actually placed on the documents by the defendant." She explained that she had "not accessed those documents" and did not "believe that they are privileged in any way." She also said: "They are basically documents that were left by the defendant in a public place." While the prosecutor's statements might have been interpreted to refer to the privileged documents, her assertions that the documents were not "privileged in any way" and had been "left by the defendant in a public place" were consistent with defendant's preexisting understanding that the privileged documents had not been produced by Cadence (and therefore were not on the CD) and that the CD contained only those documents that had been on Cadence's server rather than on defendant's Cadence-issued laptop.

And the court's response to the prosecutor's statement seemed to assure defendant that any objections at that time would be premature. The court's statement was not clear enough that a layperson would have known whether the court was taking "under submission" the issue of admissibility or the issue of access to the documents. The fact that the court delayed any ruling "until such time you have had an opportunity to research any objections counsel may have as to those documents" could have provided defendant with further reassurance that it was not necessary to object at this time. And defendant could not rely on Harmon to understand that an objection was necessary. Harmon mistakenly believed that the prosecutor's reference to a CD referred to the CD of emails from defendant's first Cadence-issued laptop.

Taken in context, the undisputed evidence establishes that the absence of an objection by Harmon or defendant on April 23 did not amount to a consent to disclosure of the privileged information. This is unlike the situation in *Calvert v. State Bar* (1991) 54 Cal.3d 765 [1 Cal.Rptr.2d 684, 819 P.2d 424] where the holder of the privilege was deemed to have waived the privilege when, after the privilege issue was raised at a hearing, the holder consulted with her attorney regarding the issue and did not instruct the attorney to claim the privilege. (*Calvert* at p. 780.) The April 23 proceedings did not unambiguously raise the privilege issue because the prosecutor's statements did not clearly describe which documents were at issue, and a reasonable layperson could have understood the court's statement to reserve any claim of privilege for later resolution. Therefore, the prosecutor failed to prove that defendant waived his privilege as to the information in these documents.

We conclude that the trial court erred in finding that the information in the password-protected documents on the second laptop was not privileged and in concluding that the privilege was waived. Defendant seeks (and sought below) recusal of the prosecutor and the district attorney's office and suppression of the documents. Obviously suppression of these privileged documents is necessary.

▬ "Undeniably there are circumstances in which the participation of a district attorney in a criminal trial as prosecutor would be improper." (*People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 261 [137 Cal.Rptr. 476, 561 P.2d 1164] (*Greer*).) The district attorney's possession of a criminal defendant's confidential attorney-client information regarding the charged offenses is a proper basis for disqualifying the district attorney from participating in the prosecution to ensure a fair trial. (Cf. *Greer*, at pp. 261–262; *State Compensation Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644, 656–657 [82 Cal.Rptr.2d 799]; Code Civ. Proc., § 128, subd. (a).) Because the trial court found that the documents were not privileged, it did not consider whether the prosecutor's perusal of these privileged documents merited disqualification of her or of the entire district attorney's office. Should the district attorney's office elect to retry this case, the trial court shall hold a hearing to consider whether recusal of the prosecutor or the district attorney's office is merited due to the prosecutor's exposure to the privileged attorney-client information.

## C. Other Issues*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1027.

### III. Disposition

The judgment is reversed, and the matter is remanded for possible retrial. If the prosecution elects to retry defendant, the trial court shall suppress defendant's statement to Witmer, and it shall also suppress the information in the password-protected privileged documents obtained from defendant's second Cadence-issued laptop computer. It shall also hold a hearing on whether to recuse the prosecutor or the district attorney's office due to the prosecutor's exposure to the privileged information. The trial court shall otherwise proceed in accordance with the views expressed in this opinion.

Rushing, P. J., and Elia, J., concurred.